DECISION
This is a timely appeal from a decision of the Personnel Appeal Board of the State of Rhode Island (hereinafter "Board"). Jurisdiction in this Superior Court is pursuant to R.I.G.L. (1993 Reenactment) § 42-35-15.
CASE TRAVEL/FACTS
A review of the record consisting of transcripts of four Board Hearings[1] indicates that Vincent A. Mattera (hereinafter sometimes "Petitioner") had been employed at the Department of Environmental Management (hereinafter "DEM") since 1978 and in state service since 1962. Pursuant to R.I.G.L. (1990 Reenactment) § 36-4-39, the Director of DEM ordered the involuntary retirement of Mr. Mattera. Mr. Mattera requested an administrative hearing before the Personnel Appeal Board.
Hearing of February 6, 1992
The first hearing was held on February 6, 1992. At this hearing, the parties recorded a pre-hearing conference stipulation that these hearings would involve solely the involuntary retirement issue relative to Mr. Mattera.[2]
Hearing of September 8, 1992
At the second Board Hearing, pertaining to maintenance of personnel records, Melanie Mouradjian, Labor Relations Coordinator for DEM testified that DEM utilizes timecards to keep track of the employee's time and benefits. (Tr. 9/8/92, p. 3). She authenticated Mr. Mattera's timecards for July 1990 to December 29, 1990 and January 5, 1991 to June 1991 and detailed Mr. Mattera's work record for those periods as follows: Mr. Mattera served a thirty-day suspension from November 12. 1990 to December 12, 1990; he took authorized vacation from December 13, 1990 to January 14, 1991; effective January 15, 1991, Mr. Mattera was reassigned to Mr. James Fester, Assistant Director of Regulations, and then to Mr. Getz in the Medical Waste Tracking Program; on January 15, 1991, Mr. Mattera worked seven hours; on January 16, 1991, he used seven hours of family sick leave; he worked seven hours on January 17, 1991; he worked three hours on January 18, 1991 and used four hours of personal time; on January 22, 1991, Mr. Mattera worked seven hours; Mr. Mattera used sick leave from January 22, 1991 until June 15, 1991, the effective date of his involuntary retirement. (Tr. 9/8/92, p. 3-5, 27-28; State Exhibit 4).
Ms. Mouradjian further testified about the DEM's policy requiring any employee on an extended sick leave to submit an appropriate physician certificate. (Tr. 9/8/92, p. 5). She testified that DEM routinely contacts an employee's physician when an employee is absent from work due to an illness in excess of three days. (Tr. 12/3/92, p. 2).
In this case, the first physician certificate stated that Mr. Mattera was seen and treated for an acute and chronic illness and was advised to remain out of work until further notice. (Tr. 9/8/92, p. 6; State Exhibit 5). The physician certificate was inadequate; it lacked a physician signature, condition, prognosis and anticipated date of return. (Tr. 9/8/92, p. 6; State Exhibit 23). DEM subsequently contacted the physician's (Dr. DeConti's) office directly and informed that office as to the necessary elements of a physician certificate. (Tr. 9/8/92, p. 6; State Exhibit 23).
DEM received a second physician certificate on January 27, 1991. (Tr. 9/8/92, p. 7). That certificate stated that Mr. Mattera was seen, treated and had been advised by Dr. DeConti to refrain from all present work due to the nature of his underlying illness and to remain out of work until further notice. (State Exhibit 6). Again, DEM informed Mr. Mattera that the physician certificate was inadequate and reiterated to him the necessary elements of a physician certificate. (Tr. 9/8/92, p. 7). At that time, DEM informed Mr. Mattera that he would be marked as "Leave Without Pay" until an appropriate physician certificate was received. (Tr. 9/8/92, p. 7). On January 28, 1991, DEM sent a letter to Dr. DeConti which specified the necessary elements of a physician certificate. (Tr. 9/8/92, p. 7; State Exhibit 7).
On February 1, 1991, DEM received another letter from Dr. DeConti. (Tr. 9/8/92, p. 8). Dr. DeConti provided Mr. Mattera's conditions, his prognosis and advised that Mr. Mattera remain out of work for a further indefinite period. (Tr. 9/8/92, p. 8; State Exhibit 5). In that letter, Dr. DeConti opined that Mr. Mattera's functional performance at his place of employment would be such that he would not be able to carry on his normal duties in an acceptable fashion. (State Exhibit 8).
On March 28, 1991, DEM wrote to Dr. DeConti requesting an updated evaluation of Mr. Mattera's condition, his prognosis and a return-to-work date. (Tr. 9/8/92, p. 8) On April 3, 1991, DEM received a letter from Dr. DeConti which reported an office visit by Mr. Mattera and mentioned that Mr. Mattera was also under the care of a psychiatrist, Dr. Beltran; Dr. DeConti deferred to Dr. Beltran as to Mr. Mattera's potential return-to-work date. (Tr. 9/8/92, p. 8; State Exhibit 10).
On April 4, 1991, DEM sent a written request for Dr. Beltran's evaluation of Mr. Mattera's condition, his prognosis and a return-to-work date. (Tr. 9/8/92, p. 9; State Exhibit 11). On April 12, 1991, DEM received Dr. Beltran's report which outlined Mr. Mattera's condition as less depressed, less tense and anxious, his prognosis was good, but a return-to-work date could not be determined. (Tr. 9/8/92, p. 9; State Exhibit 12). In response, on April 16, 1991, DEM sent a letter to Mr. Mattera acknowledging his three month absence from duty, that neither Dr. DeConti nor Dr. Beltran was able to determine when Mr. Mattera would be physically capable of returning to work, and that Mr. Mattera's condition had left him unable to perform his duties for three months. (Tr. 9/8/92, p. 9-10; State Exhibit 13). It requested that after conferring with his physicians, Mr. Mattera respond with an expected return-to-work date,[3] (Tr. 9/8/92, p. 9-10; State Exhibit 13). Additionally, the letter notified Mr. Mattera that should he fail to respond, the DEM would interpret that as a declaration that he was physically incapable of the efficient performance of his duties for an indefinite time and that DEM would pursue involuntary retirement under R.I.G.L. §36-4-39. (Tr. 9/8/92, p. 10; State Exhibit 13). On April 22, 1991, DEM received a reply from Mr. Mattera's counsel. (Tr. 9/8/92, p. 10; State Exhibit 14). That letter referenced Dr. DeConti's February 1, 1991 memorandum to DEM, which stated that Mr. Mattera "[wa]s presently incapable of resuming his employment duties" and that Mr. Mattera would seek a medical review, including an expected return-to-work date. (Tr. 9/8/92, p. 10; State Exhibit 14). In response, DEM wrote back that the medical reports since January 21, 1991 had yet to specify a diagnosis of a particular condition and an anticipated duration of absence. (Tr. 9/8/92, p. 10; State Exhibit 15).
On May 9, 1991, DEM received a May 3, 1991 memorandum from Mr. Mattera's counsel stating that Mr. Mattera had a May 9, 1991 appointment with Dr. DeConti and a May 14, 1991 appointment with Dr. Beltran. (Tr. 9/8/92, p. 11). His counsel also wrote that upon his receipt of the medical reports, he would forward them to DEM. (Tr. 9/8/92, p. 11; State Exhibit 16). DEM received no further medical reports from Mr. Mattera's counsel. (Tr. 9/8/92, p. 11). As follow-up, DEM requested in writing that Dr. DeConti provide an updated report after the May 9, 1991 appointment (Tr. 9/8/92, p. 11; State Exhibit 17). The DEM also requested an updated report from Dr. Beltran after the May 14, 1991 appointment. (Tr. 9/8/92, pp. 11-12).
Dr. DeConti responded with a one-page office memorandum. (Tr. 9/8/92, p. 12). In the May 9, 1991 office note attached to his memorandum, Dr. DeConti noted that: Mr. Mattera was clinically much better but still had not returned to work; Mr. Mattera had tried on his own to discontinue/decrease his medications and had a recurrence of symptoms; and that Mr. Mattera would see Dr. Beltran within the week and had been evaluated by Dr. Barry. (Tr. 9/8/92, p. 35). Dr. DeConti planned to see Mr. Mattera in three months and deferred a return-to-work date for Mr. Mattera to Dr. Beltran. (State Exhibit 19).
In the absence of a response from Dr. Beltran, DEM made numerous attempts to telephone Dr. Beltran. (Tr. 9/8/92, p. 12; State Exhibit 23). On May 30, 1991, DEM indicated to Dr. Beltran that the length of disability was fairly critical information. (Tr. 9/8/92, p. 12, 15; State Exhibit 18). Dr. Beltran informed DEM that Mr. Mattera was unable to return to work at that time, which is why he could not respond to DEM's written request. (Tr. 9/8/92, pp. 12-13). Further, Mr. Mattera was making progress; he had appointments every two to three weeks and would be in the following week. (Tr. 9/8/92, pp. 12-13). In order to identify when Mr. Mattera could return to work, the doctor indicated the need to study the case and do further evaluations, but Dr. Beltran gave no time frame for any further evaluation. (Tr. 9/8/92, p. 13). In response to DEM's request for a return-to-work date, Dr. Beltran provided a note stating that "at the time of Mr. Mattera's last visit on May 14, 1991, it could not be determined definitely when he would be able to return to work" and further, that after Mr. Mattera's June 6, 1991 appointment, Dr. Beltran would provide a definite return to work date for Mr. Mattera. (Tr. 9/8/92, p. 13; State Exhibit 20).
After May 30, 1991, no medical reports were received from either Dr. DeConti or Dr. Beltran. (Tr. 9/8/92, p. 13). Neither physician suggested contact with Dr. Barry. (Tr. 9/8/92, p. 13). DEM was not aware that Mr. Mattera was treating with Dr. Barry and had not received any report from Dr. Barry. (Tr. 9/8/92, pp. 34-35). DEM had not been referred to Dr. Barry by Dr. DeConti, as had been done by Dr. DeConti regarding Dr. Beltran. (Tr. 9/8/92, p. 36).
Hearing of December 3, 1992
Ms. Mouradjian testified that on June 3, 1991, the Director of DEM notified Mr. Mattera in writing that: "over the past five (5) months, correspondence from [Mr. Mattera's] physicians, Drs. Beltran and DeConti, regarding [his] present medical condition, which [had] prevented [his] return to work since January 23, 1991 . . . not only prevents [him] from performing [his] duties at [that] time, but also for a further indefinite period of time; [g]iven the critical needs of the Department to have its managerial positions fully staffed, and [his] continuing disability, [she was] ordering [Mr. Mattera's] retirement from the Department effective June 15, 1991 pursuant to G.L. §36-4-39; [he would] receive payment for accumulated sick leave and vacation according to the formulas contained in the Personnel Rules, and [that] Mr. Mattera also should contact the State Retirement Office regarding [his] pension eligibility." (Tr. 9/8/92, pp. 13-14; State Exhibit 21). The returned-mail receipt indicated that Mr. Mattera received the June 3, 1991 letter on June 6, 1991. (Tr. 12/3/92, p. 3; State Exhibit 21).
At this hearing, the Board also "allow[ed]" exploration of an "alternative purpose" motivating the decision to involuntarily retire Mr. Mattera, then Deputy Chief of ISDS. (Tr. 9/8/92, pp. 13, 26-27). The Director of DEM testified that during the first five months of her tenure as Director, the Department needed to cut sixty-six employees but that her June 3, 1991 letter to Mr. Mattera was not issued to prevent Mr. Mattera's return to work. (Tr. 12/3/92, p. 8-9). During a time of layoffs, when DEM needed all the help it could get, Mr. Mattera's absence was ongoing. (Tr. 12/3/92, p. 12). The Director testified that there was no doubt as to the accuracy of the diagnosis but rather there was a lack of responsiveness as to a return-to-work date. (Tr. 12/3/92, p. 24). She testified that Mr. Mattera's involuntary retirement was effective on June 15, 1991 and that she expected to be told if a return-to-work date was provided as promised after Mr. Mattera's June 6, 1991 evaluation by Dr. Beltran. (Tr. 12/3/92, pp. 27-28, 32). After six months of making inquiry, the information was incomplete as to whether Mr. Mattera would ever come back to work, and the Director was "honestly concerned" as to whether Mr. Mattera would ever return to work. (Tr. 12/3/92, p. 12, 28-29)
Hearing of January 28, 1993
At the fourth Board Hearing, the parties stipulated to DEM's personnel staff notes in Mr. Mattera's personnel file. (Tr. 1/28/93, p. 1). The notes reflect DEM's contacts with Mr. Mattera or his physicians. (State Exhibit 23).
The Board also heard testimony from Mr. Mattera. He testified that he was first employed by DEM around 1978. (Tr. 1/28/93, p. 3). Prior to that, he was employed in the state's Department of Health as a sanitary engineer. (Tr. 1/28/93, p. 3). From 1978 to 1988, Mr. Mattera progressed in rank to the position of Deputy Chief of the ISDS Program. (Tr. 1/28/93, p. 4).
Mr. Mattera testified that he was informed by DEM of the physician certificate requirement. (Tr. 1/28/93, pp. 12-14). He told his physician to contact DEM directly. (Tr. 1/28/93, pp. 12-14). He gave both Dr. DeConti and Dr. Beltran full authority to release his medical information to DEM. (Tr. 1/28/93, p. 17).
On February 18, 1994, after completion of the hearings, the Board issued its decision that [Personnel Rule] 5.0626 implicitly allows for involuntary retirement of an employee before exhausting all of his accrued sick leave and that the Director acted within the scope of her authority when she ordered Vincent A. Mattera be involuntarily retired. Decision at p. 3. In support of its decision, the Board made the following findings of fact: that during the period of his sick leave, Mr. Mattera was treated by various physicians; that several times during that period, DEM requested updated medical reports on his condition; that at least one physician diagnosed his disability as " . . . stress, anxiety and depression"; that based on those reports, DEM informed Mr. Mattera in April that consideration was being given to placing him on involuntary retirement pursuant to R.I.G.L. § 36-4-39; that on May 20, 1994, Dr. DeConti told DEM that Mr. Mattera could not return to work until cleared by Dr. Beltran; that on May 30, 1994, Dr. Beltran was unable to determine when Mr. Mattera could return to work and that he would provide a return-to-work date after seeing Mr. Mattera on June 6, 1994; that on June 3, 1994, the Director sent a notice to Mr. Mattera informing him that he would be involuntarily retired as of June 15, 1994. The instant appeal followed.
STANDARD OF REVIEW
The review of a contested agency decision by the Superior Court is subject to Rhode Island General Laws, Section 15, Chapter 35, Title 42 of the Reenactment of 1993. Section 15 entitles a person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final order in a contested case to seek judicial review. R.I.G.L. §42-35-15 (a). Subpart (g) of § 42-35-15 states the standard applied by the Court in its review.
 Subpart (g) states,
 The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the Agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact.Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. Rhode Island Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Agency's decision. Newport Shipyard v. Rhode IslandCommission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897. (quoting Caswell v.George Sherman Sand Gravel Co., 120 R.I. 1981, 424 A.2d 646, 647 (1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept.of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts.Carmody v. Rhode Island Conflict of Interests Commission, 509 A.2d at 458. On review of the Superior Court's judgment, the Supreme Court determines whether legally competent evidence exists to support the decision of the Superior Court. RhodeIsland Public Telecommunications Auth. v. Rhode Island LaborRelations Bd., 650 A.2d 479, 485 (1994).
COURT'S REVIEW OF THE CERTIFIED RECORD
In the Board's Decision, dated February 18, 1994, the major issues addressed were: (1) whether Mr. Mattera's involuntary retirement was proper under R.I.G.L. § 36-4-39 and (2) whether exhaustion of Mr. Mattera's accrued sick leave was required prior to his involuntary retirement.
The Involuntary Retirement Order
With respect to whether Mr. Mattera had become incapable of or unfit for the efficient performance of the duties of his position by reason of infirmity due to disability the Board had the following evidence before it: (1) incomplete responses to DEM's repeated request for medical information, (2) specific occasions when DEM informed Mr. Mattera of the unsatisfactory medical information, (3) repeated efforts by DEM to obtain the necessary information and (4) despite DEM's efforts to obtain the necessary information, Mr. Mattera's ongoing failure to provide a return-to-work date. This evidence of record is set out above in detail. (See Case Travel/Facts, pp. 1-8). Further, the Director testified that her decision to involuntarily retire Mr. Mattera was motivated by the need for efficient department operations during a period of layoffs. (Case Travel/Facts, p. 7).
The express purpose of Chapter 4 of Title 36 is "to guarantee to all citizens a fair and reasonable opportunity for public service, to establish conditions of service which will attract officers and employees of character and capacity, and to increase the efficiency of the governmental departments and agencies by the improvement of methods of personnel administration." R.I.G.L. (1990 Reenactment) § 36-3-2 (b). Specifically, R.I.G.L. (1990 Reenactment) § 36-4-39 provides that:
 When an employee has become physically or mentally incapable of or unfit for the efficient performance of the duties of his or her position by reason of infirmities due to advanced age or other disability, it shall be the duty of the appointing authority to transfer the employee to less arduous duties or to order his or her retirement. The appeal procedure for dismissals shall apply to retirements ordered under authority of this section.
In its decision, the Board articulated the evidence relating to Mr. Mattera's involuntary retirement as:
 During the period of his sick leave, Mr. Mattera was treated by various physicians. Several times during that period, the Employee Relations Office at the DEM requested updated medical reports on his condition. At least one of them diagnosed his disability as, ` . . . stress, anxiety and depression.' Based upon those reports, the Employee Relations Office wrote to Mr. Mattera on April 16, informing him that consideration was being given to placing him on involuntary retirement pursuant to Rhode Island General Law 36-4-9. . . .
 In [36-4-9], the Board finds not only the right but the "duty" of the appointing authority to either transfer or retire an individual incapable of performing the duties [of his or her position]. . . .
 The Board also finds that Mr. Mattera was on sick leave in excess of four months, but his doctors were still unable to establish a date when he would be allowed to return to work. It appears that 36-4-9 was established for just this type of situation. . . .
Decision at pp. 1, 3. Accordingly, the Board found that the Director of DEM acted within the scope of her authority when she ordered Mr. Mattera's involuntary retirement. Petitioner argues that DEM had no evidence that Mr. Mattera had become incapable of or unfit for the efficient performance of the duties of his position due to disability. Review of the record before the Board shows that Mr. Mattera's absence from work was approaching five months, that his physicians declared him unable to work and that they could not provide a return-to-work date. When a Board's factual determinations and credibility judgments in their decisions are supported by substantial evidence within the record, the Court must accept them. See Rhode Island Pub. Tel.Auth. v. Rhode Island Labor Rel. Bd., 650 A.2d 479, 485 (R.I. 1994) and Newport Shipyard v. Rhode Island Commission for HumanRights, 484 A.2d 893, 897 (R.I. 1984). After reviewing the record, the Court finds that the Board's determination is not clearly erroneous. Accordingly, the Court affirms this finding by the Board.
The Exhaustion of Sick Leave
Also at issue was whether exhaustion of accrued sick leave is a prerequisite to an employee's involuntary retirement. Rule 5.0626 of the Personnel Administration's Rules and Regulations states that:
 When the service of an employee shall be terminated by retirement (mandatory, voluntary or involuntary), or death, such employee or his/her estate shall be entitled to receive full pay for each hour of accrued sick leave to his/her credit as of the date of termination according to the following formula: . . .
I CRIR 5, Rule 01060 001 at 78 (1992). While a reviewing court may freely review a question of law to determine what the law is and its applicability to the facts, (Carmody v. Rhode IslandConflict of Interest Commission, 509 A.2d at 458), "[a]n agency's interpretation of its own guidelines is entitled to substantial deference." [citation omitted]. Citizen's Sav. Bank v. Bell, 605 F. Supp. 1033, 1041 (1985). "Generally, such an interpretation is given controlling weight unless the reviewing court determines it to be clearly erroneous or inconsistent with the law." [citations omitted]. Id. In interpreting the Personnel Rule at issue, the Board concluded that exhaustion of accrued sick leave is not a prerequisite to involuntary retirement. Although Petitioner argues that as a state employee he is entitled to exhaust his accrued sick leave prior to involuntary retirement, Rule 5.0626 expressly includes involuntary retirement as one of the three types of terminations that allow an employee to receive compensation for accrued sick leave. In applying the rule to Mr. Mattera's case, the Board found that Mr. Mattera was not entitled to exhaust his accrued sick leave prior to his involuntary retirement. After reviewing the subject Personnel Rule and the Board's interpretation thereof, the Court finds that the Board's interpretation is not clearly erroneous. Accordingly, the Court affirms this finding of the Board.
CONCLUSION
After a review of the entire record, the Court finds that the decision of the Board is supported by reliable, probative and substantial evidence in the record and that the rights of the petitioner have not been thereby prejudiced. Accordingly, the February 18, 1994 decision of the Personnel Appeal Board is hereby affirmed.
Counsel shall submit the appropriate judgment for entry.
[1] The Board Hearings occurred on the following dates: (1) February 6, 1992, (2) September 8, 1992, (3) December 3, 1992, and (4) January 28, 1993.
[2] Mr. Mattera had also appealed a 30-day suspension issued in November 1990. He also appealed a reassignment made in January 1991. (Tr. 9/8/92, pp. 2-3).
[3] The letter was incorrectly dated March 16, 1991 but was corrected in handwriting as April 16, 1991. (Tr. 1/28/93, p. 15; state Exhibit 13).