John STRAFACH et al.

v.

**Louise DURFEE, Director of the Rhode Island Department of Environmental Management.**

No. 92–531–M.P.

Supreme Court of Rhode Island.

Dec. 23, 1993.

Kelly M. Fracassa, Nardone, Turo & Naccarato, Westerly, for plaintiff.

Kendra Beaver, Brian A. Wagner, Providence, for defendant.

OPINION

SHEA, Justice.

This case came before the Supreme Court pursuant to the petition for certiorari of Louise Durfee, the defendant director of the Rhode Island Department of Environmental Management (DEM), to review a decision of the Superior Court that reversed DEM's de-

nial of variances sought by the plaintiffs, John and Loretta Strafach (the Strafachs). We quash the judgment of the Superior Court.

The Strafachs are the owners of real property located in the town of Westerly described as lot Nos. 279, 280, and 281 on tax assessor's plat No. 165 (the property). The property is located on both the north and the south sides of Atlantic Avenue in the Misquamicut section of Westerly. The parcel on the north side of Atlantic Avenue is adjacent to Winnapaug Pond. A motel and efficiency units were located on that side of the property. The parcel on the south side is adjacent to the Atlantic Ocean. On that side of the property there were two restaurants, a bar, a parking lot, and several motel units.

In October of 1989 the Strafachs sought to destroy the existing structures on the ocean side of the property and to replace them with a cabana complex composed of 200 cabana units, a restaurant and bar, and several townhouse units. As part of this proposed plan, the Strafachs intended to replace the existing multiple cesspool configuration with an individual sewage disposal system (ISDS) located on the ocean side of the property which facility would service the entire development.

Pursuant to G.L.1956 (1993 Reenactment) chapter 17.1 of title 42, G.L.1956 (1991 Reenactment) chapter 12 of title 46, and G.L.1956 (1987 Reenactment) chapter 56 of title 5, the director of DEM and the Environmental Standards Board have been delegated the authority to promulgate, administer, and enforce rules and regulations regarding (ISDS). The director is required "to issue and enforce such rules, regulations, and orders as may be necessary to carry out the duties assigned to the director and the Department by any provision of law." Section 42–17.1–2(s). In addition, the director is specifically directed to "establish minimum standards, subject to the approval of the environmental standards board, relating to the location, design, construction, and maintenance of all sewage dis-

posal systems." Section 42–17.1–2($l$). These minimum standards are set forth in *SD Rules and Regulations Establishing Minimum Standards Relating To Location, Design, Construction, And Maintenance Of Individual Sewage Disposal Systems* (hereinafter ISDS Regulations) are properly promulgated minimum standards under the authority of § 42–17.1–2($l$), (m), (r), and (s).

The Strafachs included a copy of the 1980 amended version of the ISDS Regulations in the appendix to their brief and made reference to the 1980 rule numbers throughout their brief. Both the variance request form submitted by the Strafachs and DEM's own memo of April 16, 1990, denying the variance request, cite the 1980 amended version of the rules. The DEM, however, supplied the 1992 amended version of the ISDS Regulations and referenced the 1992 rule numbers in its brief. We note that the 1990 version of the ISDS Regulations, promulgated in December 1989 and effective January 2, 1990, should have been applied to the variance request in this case. ISDS Regulation SD 22.02(1) of the 1990 version provides that "a request for a variance pursuant to SD 20.01 may be filed with the director where an application was filed with the director on or before the effective date of these rules [January 2, 1990] [and] no action has been taken by the director denying or approving such application." This is precisely the factual scenario of the present case. The different versions of the rules do not differ substantively, however. Since both parties initially cited and relied upon the 1980 version of the rules, we will refer to those rule numbers in this opinion.

The Strafachs submitted an application to DEM's Division of Groundwater and Freshwater Wetlands requesting permission to construct the new ISDS in October of 1989. In January of 1990, while the October 1989 application was still pending and no action had been taken by DEM, the Strafachs submitted a request for three variances from the ISDS Regulations.[1] The first variance,

---

1. In addition to the variance regarding the minimum distance of an ISDS from the ocean, the Strafachs also sought two variances to construct an open face wood-deck above the ISDS and a

swimming pool within five to fifteen feet thereof. Although no section of the ISDS Regulations specifically addresses either of these last two situations, DEM personnel were concerned about

which is the main focus of this case, relates to ISDS Regulation SD 3.05(e). This regulation specifies the minimum distance required between an ISDS and a coastal erosion-prone site. In order to understand the nature of this regulation, it is necessary to have a basic understanding of the Coastal Resources Management Council (CRMC).

The CRMC was established by the Legislature to regulate the use of land located near coastal waters. G.L.1956 (1991 Reenactment) chapter 23 of title 46. The CRMC was deemed to be the "principal mechanism for management of the state's coastal resources." Section 46-23-1(c). This legislative delegation of authority lies within the permissible bounds of article 6 of the Rhode Island Constitution. *Milardo v. Coastal Resources Management Council*, 434 A.2d 266 (R.I.1981). As we noted in *Santini v. Lyons*, 448 A.2d 124 (R.I.1982), the Legislature, being mindful of the importance and use of the coastal environment and recognizing the damage already done, could rationally conclude that it was necessary to single out coastal areas for specific regulation.

In meeting these objectives, the CRMC has been given the authority to develop policies, programs, and regulations that pertain to coastal areas. Section 46-23-6. The CRMC program has designated certain coastal regions as "erosion-prone." Both parties have acknowledged that the proposed site for the ISDS in this new development has been designated as such an area. ISDS Regulation SD 3.05(e) pertains to the construction of ISDS on erosion-prone areas. This regulation states in part:

> "Where an individual sewage disposal system will be located in the proximity of the active ocean on sites subject to erosion caused by coastal storm * * * the minimum setback requirement from the spring (moon) tide elevation to the edge of the system shall not be less than 150 feet." ISDS Regulation SD 3.05(e).

In simple terms the regulation prohibits the construction of any ISDS within 150 feet of the ocean in such designated erosion-prone areas. The proposed system would be only

115 feet from the elevation, thus requiring a 35-foot variance. In addition both parties acknowledge that there was a definite "scarp" on the site located approximately 60 to 65 feet inland from the moon high-tide line.

A scarp was consistently described in the testimony as a steep slope created by the erosive forces of wind and wave action. The sand is dug out by wave action during the winter months and deposited offshore in a sandbar. In the late spring and early summer the sand is redeposited on the beach, and the scarp disappears. Essentially a scarp is a seasonal short-term erosion. Providing that no long-term beach erosion occurs at a particular site, the scarp should reappear in the same area year after year. The presence of the scarp concerned DEM because the distance between the proposed ISDS and the scarp would be as close as 45 feet possibly causing the waves to hit the beach up to 65 feet closer to the proposed ISDS in the winter months.

The Strafachs were notified by a letter dated April 16, 1990, that all the requested variances had been denied by DEM. The DEM cited concerns about the proposed ISDS's effect on the public health, the Atlantic Ocean, the public use and enjoyment of a recreational resource, and the system's potential as a cause of public nuisance.

In May 1990 the Strafachs exercised their right to appeal the denial of the variances pursuant to ISDS Regulation SD 20.01. An administrative hearing was conducted in accordance with G.L.1956 (1993 Reenactment) §§ 42-35-9, 42-35-10, and 42-35-12. After hearing the parties and reviewing their memoranda, the hearing officer issued a written decision and order on September 5, 1991, denying the Strafachs' appeal. The decision of the hearing officer was then submitted to the director of DEM for review. "The director may adopt, modify, or reject the hearing officer's decision." *Environmental Scientific Corp. v. Durfee*, 621 A.2d 200, 203 (R.I.1993). The director of DEM reviewed

their proximity to the proposed ISDS and considered them as factors in the denial of the proposed plan. We need not reach them in this decision.

and adopted the hearing officer's decision as the final agency decision of DEM.

The DEM's final agency decision is reviewable on appeal by the Superior Court pursuant to § 42–35–15 of the Administrative Procedures Act. Such review is "conducted by the court without a jury and is confined to the record compiled during the adjudicatory proceeding." *Durfee*, 621 A.2d at 204. The Strafachs appealed the final decision of DEM, and on October 5, 1992, the Superior Court justice rendered a written decision reversing DEM in favor of the Strafachs. Subsequently, on October 26, 1992, DEM filed a petition for writ of certiorari for a review of the Superior Court decision. We granted that petition and now review the Superior Court justice's reversal of the final agency decision.

■ Our review on writ of certiorari is confined to questions of law. Section 42–35–16; *see also Barrington School Committee v. Rhode Island State Labor Relations Board*, 608 A.2d 1126, 1138 (R.I.1992). We shall not assess credibility of the witnesses or substitute our own judgment for that of the trier of fact concerning the weight of the evidence on questions of fact. *Durfee*, 621 A.2d at 208 (citing *Eastons Point Association v. Coastal Resources Management Council*, 522 A.2d 199, 202 (R.I.1987)).

We recently addressed the proper scope of the Superior Court's review of a final administrative decision and this court's review of the Superior Court's decision in *Durfee*. In that case we stated:

"The scope of review of this court, like that of the Superior Court, is an extension of the administrative process. Pursuant to § 42–35–15, that review is restricted to questions that the agency itself might properly entertain. *Eastons Point Association v. Coastal Resources Management Council*, 522 A.2d 199, 202 (R.I.1987). The Superior Court is confined to a determination of whether there is any legally competent evidence to support the agency's decision. *Barrington School Committee v. Rhode Island State Labor Relations Board*, 608 A.2d 1126, 1128 (R.I.1992). 'If competent evidence exists on the record considered as a whole, *the court is re-quired to uphold the agency's conclusions.*' " (Emphasis added.) 621 A.2d at 208.

■ Essentially our function is to determine whether there was any legally competent evidence to justify the conclusions of DEM and the Superior Court. *Id.* (citing *Barrington School Committee*, 608 A.2d at 1138). "Legally competent evidence is indicated by the presence of 'some' or 'any' evidence supporting the agency's findings." 621 A.2d at 208 (citing *Sartor v. Coastal Resources Management Council*, 542 A.2d 1077, 1082–83 (R.I.1988)). We shall not weigh the evidence, but "merely ascertain whether the [Superior] [C]ourt was justified in its modification or reversal of the [DEM] order." *Barrington School Committee*, 608 A.2d at 1138 (citing *Prospecting Unlimited, Inc. v. Norberg*, 119 R.I. 116, 123, 376 A.2d 702, 709 (1977)).

The DEM first argues that the Superior Court decision reversing DEM's denial of the variances was in error because the Strafachs failed to meet their burden. In addition DEM argues that the reversal of the final agency decision was improperly based on the Strafachs' claim of unnecessary hardship. We agree and address each of these issues separately.

I

■ As set forth in the ISDS Regulations, the burden of proof during the administrative hearing process is on the applicant. ISDS Regulation SD 20.02.

"At the hearing the applicant shall present his case to the director or his designee for quasi-judicial matters, and shall have the burden of persuading the director or his designee as aforesaid that a literal enforcement of the rules will result in unnecessary hardship, and that a variance will not be contrary to the public interest and the public health." *Id.*

The applicant must meet this burden for all factors in order to obtain a variance from the ISDS minimum requirements.

On the issue of public health and public interest, the ISDS Regulations require a specific showing by the applicant that

"(1) The disposal system to be installed will be located, operated and maintained so as to prevent the contamination of any drinking water supply or tributary thereto;

"(2) The waste from such system will not pollute any body of water;

"(3) The waste from such system will not interfere with the public use and enjoyment of any recreational resource;

"(4) The waste from such system will not create a public or private nuisance;

"(5) The waste from such system will not be a danger to the public health." ISDS Regulation SD 20.01(d).

At the hearing the hearing officer took judicial notice of the CRMC program designation of this property as an erosion-prone area. She also reminded the Strafachs that they had the burden to go forward and show by clear and convincing evidence that a variance from the 150-foot set-back requirement was warranted.

After considering the evidence presented and weighing the credibility of the witnesses' testimony, the hearing officer concluded that the Strafachs were unable to sustain their burden of proof on the issues of public health and public interest. We have reviewed the record, and we agree with that conclusion.

Over the course of the two day hearing, the Strafachs presented three witnesses: Richard Chiodini (Chiodini), a registered civil engineer employed by Siegmund Associates; Robert Angilly (Angilly), a registered civil engineer working at Environmental Resource Associates; and John Strafach, owner and developer of the property. Although the testimony of these witnesses addressed many of the technical design considerations of the new system, no substantive expert testimony was offered concerning the potential health effects of the proposed system.

The Strafachs' experts both specifically acknowledged that the site for the proposed system is within a CRMC-designated coastal critical-erosion-prone area and that the proposed system did not meet the 150-foot mini-

mum distance from the moon high-tide mark. The Strafachs contend in their brief that both their experts, Chiodini and Angilly, who were qualified as civil engineers, "concluded that [the proposed system] would have no impact on the public health and public interest as defined in the *SD Rules.*"

The Strafachs rely on a comparison of the old system of cesspools and the proposed system to demonstrate that there would be no impact on the public health or interest. The old system, which is anywhere from ten to thirty years old, comprises ten "individual disposal units" or cesspools located throughout the site. According to the testimony of Chiodini, the daily flow of the old system is 14,615 gallons per day. The new system would reduce that flow to 8,900 gallons per day, drastically curtailing the amount of effluent leaching into the soil. The Strafachs argue that this decrease in flow demonstrates that the proposed site would have an overall beneficial effect on the public health and public interest by reducing the amount of contaminants entering the ground for treatment and being treated in accordance with current standards.

The Superior Court justice put great stock in the comparison between the new and the old systems in justifying his decision to reverse the hearing officer. In his decision he stated:

"To advocate the use of a nonconforming thirty year old system in the place of a modern system with sixty-one percent less sewage discharge seems to defeat DEM's purpose rather than further it. The hearing officer's findings that the new system will adequately treat sewage and will have no adverse impact on Winnapaug Pond dictate a reversal of the denial of the variances. Winnapaug Pond, a particular source of concern for the [CRMC] would appear to benefit most from the proposed system."

One of the DEM experts who testified was James Fester (Fester). He was qualified as an expert not only in the area of civil engineering but also in the field of public health. In fact, he was the only expert to testify in the area of public health. Fester presented

significant testimony supporting his conclusion that the system as proposed could result in a danger to the public. Although he conceded that the new system, if it met all the ISDS Regulations, would be preferable to the old system, the fact that it *does not* meet the regulations cannot be overlooked.

The hearing officer reasonably relied on the testimony of Fester, the only expert in the area of public health, and determined that the Strafachs' comparison of the two systems was not sufficient to establish by clear and convincing evidence that there would be no impact on the public health and interest. The Strafachs did not present any evidence on the issue of public health. They offered Angilly's opinion that there would be no impact for swimmers as evidence in support of their burden. The testimony of Chiodini and Angilly concluding that there would be no impact on the public was limited, however, to their respective opinions as civil engineers. No additional testimony was presented to refute the testimony of Fester, who was further qualified as an expert in this specialized area.

The Strafachs made another comparison argument in an effort to justify the issuance of the variance. This comparison was between the Strafachs' property and the property immediately adjacent to the west. It seems that the erosion-prone area as designated by the CRMC ends on the western boundary of the Strafachs' property. Therefore, the property adjacent to the Strafachs on the western side would not be subject to the minimum 150-foot requirement.

To construct an ISDS on the adjacent property, the ISDS Regulations require a minimum distance of only 50 feet from the moon high-tide mark. Comparing their property to the adjacent property, the Strafachs maintained that they both have the same physical characteristics, they both have the scarp, the dune on each is approximately the same height, the sand is the same, and the recreational uses thereon are approximately the same. Therefore, they argue, it is illogical to permit an ISDS within 50 feet of the ocean on the adjacent property and not permit them to install an ISDS within 115 feet on their property.

Given the fact that their western neighbors' land did not have the same designation, the Strafachs contend that the CRMC boundary designation of the critical erosion-prone area cannot be established by any definite engineering survey. They presented testimony that attempted to dispute CRMC's designation of this property as subject to long-term erosion. The designation, they contend, was established solely by the starting point of a barrier beach between the ocean and Winnapaug Pond. In his testimony for the Strafachs, Angilly analyzed aerial photographs of the property taken in 1965 and in 1988 in an attempt to show that the erosion risks highlighted by CRMC were incorrect. Angilly conceded that his observations were not drawn from precise measurements but rather from general observations.

Both comparisons made by the Strafachs as justification of the variance were refuted by the testimony of the DEM experts. In addition to Fester, DEM presented testimony of Margaret Bradley (Bradley), a hydrologist for DEM, who was qualified as an expert in hydrology and geology and who wrote her master's thesis on shoreline erosion and accretion on the Narragansett Bay Shoreline comparing aerial photographs taken in 1939 and in 1975. Bradley gave extensive testimony on the standard techniques that a geologist uses to evaluate the extent or characteristics of shoreline erosion in a particular area. She explained that in comparing photographs to determine the erosion rate, one must compare the high-tide line of the same piece of land over time. She reviewed the photographs that Angilly had compared and determined that the high-tide line could not be located in these pictures. She concluded that without the presence of the high-tide line, the rate of erosion over time could not be established to a degree of reasonable scientific certainty. Although she could not specifically estimate the rate of the erosion on the site, she indicated that there was a relationship between the Narragansett Bay and South Shore beaches in that most of the beaches are erosional over time.

The hearing officer reasonably accepted the expert testimony presented by DEM as

credible and made a determination that the Strafachs had not met their burden as required in the ISDS Regulations. The findings of the hearing officer should have been upheld if any evidence existed on the record to support them. The Superior Court justice was required to accept those agency findings. He may not substitute his own judgment for that of the hearing officer in situations in which the judgment of the hearing officer was supported by the record. Our review of the record reveals that the agency's findings of fact and conclusions of law were amply supported by credible evidence in the record and that the Superior Court justice departed from the scope of review specified in § 42-35-15.

## II

█ The Strafachs next argue that the Superior Court properly reversed the hearing officer's denial of the variance because they would face unnecessary hardship if the variance was denied. We must disagree.

A variance is given only if it is found that "a literal enforcement of such provisions will result in unnecessary hardship to the applicant *and* that such a permit or variance will not be contrary to the public interest and public health." (Emphasis added.) ISDS Regulation SD 20.01(b). In reaching her decision, the hearing officer concluded that

"[a] finding that applicant has not met his burden with respect to the issue of public health and public interest is dispositive therefore, it is not necessary for the Hearing Officer to reach a decision if the regulation will result in unnecessary hardship to the applicant."

The hearing officer concluded that the Strafachs' failure to meet their burden by clear and convincing evidence that there was no harm to the public health or interest made it unnecessary to reach the hardship issue.

The Superior Court appears to have ignored the findings of the hearing officer on the issues of public health and interest and went on to reverse that decision solely on the basis of unnecessary hardship. Essentially the Superior Court justice substituted his own judgment for that of the hearing officer.

Ironically, the Superior Court justice outlined the proper scope of review but then went beyond it. He acknowledged the standard for review by stating:

"Section 42–35–15 precludes a reviewing court from substituting its judgment for that of the agency concerning questions of fact. *Guarino v. Dept. of Soc. Welfare* [122 R.I. 583], 410 A.2d 425, 428 (1980). A reviewing court must uphold an agency decision if there is any legally competent evidence in the record to support the agency decision. *Blue Cross & Blue Shield v. Caldarone,* 520 A.2d 969, 972 ( [R.I.]1987). This standard, however, does not preclude judicial review of questions of law and their application to the facts. *Turner v. Dept. of Emp. Sec. Bd. of Rev.,* 479 A.2d 740, [7]42 ( [R.I.]1984)."

The issue of unnecessary hardship could not have been considered by the Superior Court justice because it was out of the scope of his review.

The Superior Court made a finding that the Strafachs "experienced more than a mere inconvenience in being denied the variance." This decision was made after an analysis of the various standards for unnecessary hardship. The DEM argued that the most appropriate standards for a finding of unnecessary hardship would be the deprivation of all beneficial use of a parcel of property. The Strafachs maintain that the DEM standard is too stringent and that the Superior Court properly applied a "mere inconvenience" test.

We have never had the occasion to interpret the proper application of the unnecessary-hardship standard in the context of a DEM variance. This is not the case in which we should make such a ruling. The Strafachs did not put forth any credible evidence that there would be unnecessary hardship. The record even indicates that there was a possible alternative to the proposed location of the ISDS, but the testimony relating to that alternative offered by Angilly was nothing more than an explanation that relocation would be a "great hassle" and have some possible impact on Winnapaug Pond.

There was insufficient evidence on the record about what would constitute unnecessary

hardship. That issue was never adequately addressed by the Strafachs in the hearing before the agency and was not reached by the hearing officer because of her conclusion on the issue of public health.

For these reasons the petition for certiorari is granted, the judgment of the Superior Court is quashed, and the papers of the case are remanded to the Superior Court with our decision endorsed thereon and for entry of judgment affirming the final agency decision appealed from.