DECISION
This is an appeal from a decision of the Department of Environmental Management (DEM). Thomas Grossi (plaintiff) seeks reversal of DEM's denial of his application for a variance from DEM septic regulations. Jurisdiction in this Court is pursuant to G.L. 1956 § 45-35-15.
 Facts/Travel
The plaintiff owns real property at Pole #10 Mast Street, lot 260 on Assessor's Plat 14, Jamestown, Rhode Island. On October 2, 1992, the plaintiff requested variances from DEM regulations pertaining to the installation of an individual septic disposal system (ISDS) on lot 260. Joint Exhibit 4. On October 5, 1992, the plaintiff filed an application with DEM for a permit to install an ISDS on lot 260. Joint Exhibit 3.
The plaintiff sought variances from DEM's Rules and Regulations Establishing Minimum Standards to Location, Design, Construction and Maintenance of Individual Sewage Disposal Systems, 6 CRIR 3 12 120 002 (ISDS Regulations) sections 3.05 (1), (4); 2.14; 10.01 and 11.06 (2). Regulation 3.05 (1) requires a minimum distance of 100 feet between the disposal trench, bed or chambers and a private well. The plaintiff's proposed ISDS chambers would be located less than 100 feet from the wells of two adjacent lots and less than 100 feet from the plaintiff's proposed well. Regulation 3.05 (4) requires a minimum distance of ten feet between the disposal chambers and the property lot line. The plaintiff's proposed ISDS would be located three feet from the property line. Regulation 2.14 requires sufficient additional area for replacement of the disposal field in case of system failure. No such alternate disposal area was included in the plaintiff's proposal. (Tr. March 7, 1994 at 51). Regulation 10.01 requires all septic systems to serve at least a three bedroom dwelling. The plaintiff's ISDS proposal was designed for a two bedroom dwelling. (Tr. March 7, 1994 at 63). Lastly, regulation 11.06 (2) requires the removal of all trees and brush within 10 feet of the leach field. Because the ISDS is located within three feet of an adjacent lot, the plaintiff would not be able to control the growth of trees and bushes within the entire ten feet buffer area. (Tr. March 7, 1994 at 64-66).
After a review of the plaintiff's application, DEM requested further testing of groundwater on the site by the plaintiff. (Tr. Jan. 19, 1994 at 95). Pursuant to ISDS Regulations 20.00 (d) and 20.01 (e), (f), in February 1993, DEM requested the plaintiff to perform a cumulative impact assessment for the lot. (Tr. Jan. 19, 1994 at 95). The cumulative impact assessment involved an analysis of the quality of the ground drinking water in the lots near lot 260 to determine the current levels of pathogens and nitrates in the water. (Tr. March 7, 1994 at 78-80). At a meeting with the plaintiff on March 9, 1993, DEM instructed the plaintiff to test the well water of seven abutting and nearby lots. (Tr. Jan. 19, 1994 at 96-97). The plaintiff was able to gain permission to test the well water of only two landowners. (Tr. Jan. 19, 1994 at 99). The two lots tested are not immediately adjacent to the plaintiff's lot. (Tr. Jan. 19, 1994 at 100-101). From lots 257 and 223, the plaintiff submitted the test results of well water which showed acceptable levels of nitrates in the drinking water according to Department of Health standards. (Tr. March 8, 1994 at 19). However, DEM was concerned about the results of the tests because they showed a higher level of nitrates than those of other similar areas of the state. (Tr. March 8, 1994 at 21). The DEM offered to assist the plaintiff in securing permission to test the well water of the other five lots. (Tr. March 8, 1994 at 30-31, 35-36; Tr. Jan. 20, 1994 at 71-72). The plaintiff refused DEM's offer of assistance and refused to do any more well water testing. (Tr. March 8, 1994 at 41-42; Tr. Jan. 20, 1994 at 72, 74.
On September 27, 1993 DEM denied the plaintiffs ISDS application and variance requests. The decision letter stated that "the applicant did not provide convincing evidence to demonstrate that the degree of environmental protection provided under the Rules can be achieved without strict application of the particular provisions from which variances were requested." (Joint Exhibit 9). The plaintiff requested an adjudicatory hearing. A hearing officer took testimony and received evidence on January 19, January 20, March 7 and March 8, 1994.
At the hearing, Richard Costa testified on behalf of the plaintiff that lot 260 was worth between $50,000 and $55,000 on the open market. (Tr. January 19, 1994 at 28). Costa testified that the property would be worthless if the plaintiff were denied an ISDS permit. (Tr. January 19, 1994 at 29). William Dowdell testified as an expert in environmental engineering on behalf of the plaintiff. Dowdell determined after conducting tests and consulting ground water maps that the groundwater flowed in the opposite direction from the abutters' wells. (Tr. January 19, 1994 at 82). Therefore, Dowdell believed that the ISDS would not pose a danger to drinking water. The plaintiff himself testified that DEM led him to believe that abutting homeowners would not be able to object to his proposal if they refused to grant permission for the plaintiff to test their well water. (Tr. January 20, 1994 at 46). The plaintiff also stated that he would have no beneficial use of the property without an ISDS permit. However, the plaintiff said that he had not read the Jamestown Zoning Ordinance to explore other uses for the property. (Tr. Jan. 20, 1994 at 70).
Russell Chateauneuf, Chief of the Division of Groundwater and ISDS for DEM, testified as an expert witness on engineering and ISDS. Chateauneuf testified that because the soil overlying the bedrock is thin, the construction of a new well and an ISDS could alter the direction of the groundwater flow. (Tr. March 7, 1994 at 57-58). Chateauneuf concurred with the assessment of DEM engineer Mohamed Freij that the construction of a house, ISDS, and well would very likely change the direction of groundwater flow. (Tr. March 7, 1994 at 66-71; DEM Exhibit 7). Based on the hydrogeological setting, Chateauneuf did not believe that the proposed ISDS offered the same environmental protection as an ISDS which complied with the 100 feet minimum separation between the system and a private well. (Tr. March 7, 1994 at 53-54, 57). Chateauneuf also testified that he had insufficient data to determine whether the ISDS would have an adverse impact on public drinking water. (Tr. March 8, 1994 at 29-30, 44). Chateauneuf testified that the failure of the plaintiff to test the well water of all seven wells, including the two wells adjacent to the plaintiff's lot, prevented an adequate assessment of the proposed ISDS's impact on the public drinking water supply. (Tr. March 8, 1994 at 44-45). Because an ISDS will discharge significant quantities of nitrates into groundwater, Chateauneuf believed additional wells needed testing in order to determine whether nitrate levels would remain safe once the plainttiff's ISDS began operation. (Tr. March 8, 1994 at 27-30).
Chateauneuf analyzed the plainttiff's other variance requests and determined that they would not afford the same degree of protection for the environment as a proposal which complied with the ISDS regulations. Chateauneuf testified that the absence of an alternate leach field from the plaintiffs proposal would not protect the environment as well as a system which has an alternate field for displacement of effluent if the ISDS should fail. (Tr. March 7, 1994 at 51). Chateauneuf also testified that the plaintiffs proposal to locate the ISDS within three feet of his property line would increase the risk of activities on the abutting property causing interference with the ISDS. (Tr. March 7, 1994 at 61-62). Chateauneuf noted that a three-bedroom sized ISDS would better protect the environment than the plainttiff's two-bedroom design because a three-bedroom design has less risk of failure. (Tr. March 7, 1994 at 64). Chateauneuf stated that the close proximity of the ISDS to the property line (three feet) would not allow the plaintiff to ensure that trees and shrubs did not grow within ten feet of the system. (Tr. March 7, 1994 at 66). Uncontrollable growth of vegetation from the abutting property, including tree roots, could cause failure in the system. (Tr. March 8, 1994 at 79). Furthermore, Chateauneuf noted that the plaintiff's proposal did not comply with section 11.06 (1), as the proposal did not provide for installation of five feet of gravel fill around the leach field perimeter. The plaintiff did not specifically request a variance from section 11.06 (1).
The hearing officer issued a decision which was entered as a final agency order on September 9, 1994. In his decision, the hearing officer found that the plaintiff failed to prove by clear and convincing evidence that the ISDS would not be contrary to the public health and environment. The hearing officer also found that the plaintiff failed to prove by clear and convincing evidence that the system would be operated so as to prevent contamination of drinking water and failed to prove that the system would not pose a danger to public health. In addition, the hearing officer found that the plaintiff did not prove by clear and convincing evidence that the system would function as proposed. The hearing officer did not find any evidence of record to support the plaintiffs request for variances from sections 2.14, 3.05 (4), and 11.06 (2) (Decision of September 9, 1994 at 17). On the danger to the drinking water supply posed by the plaintiff's proposed ISDS, the hearing officer found the testimony of Chateauneuf most credible. (Decision of September 9, 1994 at 19). The hearing officer stated that the plaintiff offered no valid reason for failing to procure testing of the water quality of five nearby wells. The hearing officer also stated that the plaintiff's plan did not take into account the possibility of tree roots from abutting property growing undetected underground to interfere with the septic system. Additionally, the hearing officer found that the plaintiff offered only "meager evidence" to support his variance requests for sections 3.05 (1) and 10.01 (Decision of September 9, 1994 at 17). The hearing officer decided that such evidence on the slope of groundwater was undercut by the credible testimony of Chateauneuf, and therefore, the plaintiff's evidence was not sufficient for the plaintiff to carry his burden of proof that the proposal was not contrary to the environment and public health.
The hearing officer also discounted the plaintiff's argument that DEM was imposing an unnecessary hardship by denying the ISDS application. The hearing officer found that the plaintiff could propose other ISDS designs and use his land for other purposes. The hearing officer disagreed with the plaintiffs argument that a hearing officer must make an adverse inference if one party fails to call proposed witnesses. Furthermore, the hearing officer found that an adverse inference was not required in such a situation, and the proposed DEM witnesses would have offered only cumulative testimony. Finally, the hearing officer denied the plaintiff's ISDS application and request for variances.
The plaintiff filed a timely appeal of the hearing officer's decision to this Court. On appeal, the plaintiff argues (1) that he presented clear and convincing evidence entitling him to the requested variance; (2) the denial of the ISDS permit constituted a "taking" without just compensation in violation of the United States and Rhode Island Constitutions; (3) the hearing officer erroneously relied on the testimony of DEM's expert on "blue-baby" syndrome; (4) the hearing officer committed error in not drawing an adverse inference from DEM's decision not to call two witnesses; (5) the hearing officer erred in not allowing the plaintiffs attorney to withdraw in order to serve as a testifying witness and (6) the hearing officer erred in allowing hypothetical questions which had no foundation.
 Standard of Review
The review of a decision of the Commission by this Court is controlled by R.I.G.L § 42-35-15 (g), which provides for review of a contested agency decision:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 "(1) In violation of constitutional or statutory provisions;
 "(2) In excess of the statutory authority of the agency;
 "(3) Made upon unlawful procedure;
 "(4) Affected by other error of law;
 "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency.Berberian v. Dept. of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. CoastalResources Management Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflicts ofInterests Commission, 509 A.2d at 458. The Superior Court's role is to examine whether any competent evidence exists in the record to support the agency's findings. Rocha v. Public Util. Comm'n.,694 A.2d 722, 727 (R.I. 1997). The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island PublicTelecommunications Authority, et al. v. Rhode Island LaborRelations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
 Burden of Proof
The plaintiff argues that he is entitled to his variance requests because he would suffer more than a mere inconvenience if denied those variance requests. The plaintiff argues that the uncontradicted testimony of his expert witness indicated that the ISDS would function properly and would not have an effect on the drinking water supply. The plaintiff further disputes the danger of tree growth from abutting lots, arguing that he can cut any roots which encroach on his property. The plaintiff points out that he needs the variances because of the close proximity of abutting landowners' wells to the plaintiffs lot.
The DEM argues that the decision of the hearing officer rejected the plaintiff's expert witness's testimony and instead found DEM's expert witness "most credible." DEM argues that the plaintiff did not carry his burden to establish by clear and convincing evidence that the variances would not be contrary to the public health. In fact, DEM states that the plaintiff failed to present any evidence in support of three of his variance requests, and therefore the plaintiffs application was properly denied.
 Before the hearing officer
 "[a]t the adjudicatory hearing, the applicant shall have the burden of proof to demonstrate through clear and convincing evidence that:
 (1) A literal enforcement of the Regulations will result in unnecessary hardship;
 (2) That the system will function as proposed in the application; and
 (3) That the issuance of a permit will not be contrary to the public interest, public health and environment." ISDS Regulation 21.02 (a)
The Rhode Island Supreme Court in interpreting a similar version of the above regulation stated that "[t]he application must meet this burden for all factors in order to obtain a variance from the ISDS minimum requirements." Strafach v. Durfee, 635 A.2d 277, 280 (R.I. 1993). In addition, "[i]n order to demonstrate that the proposed Individual Sewage Disposal System will not be, contrary to the public interest, public health and the environment, the applicant must introduce clear and convincing evidence to the satisfaction of the Director that
 (1) The waste from the proposed system will not be a danger to public health;
 (2) The disposal system to be installed will be located, operated and maintained so as to prevent the contamination of any drinking water supply or tributary thereto;
 (3) The waste from the proposed system will not pollute any body of water or wetland;
 (4) The waste from the proposed system will not interfere with the public use and enjoyment of any recreational resource; and
 (5) The waste from the proposed system will not create a public or private nuisance." ISDS Regulation 21.02 (b).
In Strafach. supra, the applicant sought a variance from an ISDS regulation requiring a 150 foot setback from the Spring tide elevation. The Court said, "[t]he hearing officer reasonably accepted the expert testimony presented by DEM as credible and made a determination that the Strafachs had not met their burden as required in the ISDS Regulations. The findings of the hearing officer should have been upheld if any evidence existed on the record to support them. The Superior Court justice was required to accept those agency findings." Strafach.A.2d at 283.
Similarly, this Court finds that the plaintiff in the instant case did not meet his burden to demonstrate by clear and convincing evidence that the issuance of a permit for his proposed ISDS would not be contrary to the public health and environment. The plaintiff did not adequately test the water quality of the nearby wells, testing only two wells which were not adjacent to the plaintiff's lot, instead of the seven wells requested by DEM. The plaintiff failed to test two wells situated on lots abutting the plaintiffs lot. Because of the inadequate testing, DEM was unable to determine whether the plaintiffs proposed ISDS would increase the amount of nitrates to unsafe levels in drinking water. DEM offered to assist the plaintiff in obtaining more test samples of nearby wells. The plaintiffs proposal also failed to take into account a possible shift in the ground water flow from construction of a well, ISDS, and a house. DEM engineer Mohamed Freij, in his variance review, found it very likely that such construction would change the direction of the groundwater flow. (DEM Exhibit 7). ISDS expert Chateauneuf concurred with this assessment. The plaintiff's proposal contained no contingency plans to protect against a change in groundwater flow. Finally, the record evidences that the plaintiff offered virtually no evidence in support of the proposition that the absence of an alternate leach field; a deviation from the 10 foot setback from the property line; and a deviation from the 10 foot setback from tree growth would not be contrary to the public health and environment. The plaintiff merely pointed out that he could cut overgrown tree roots from abutting property. The hearing officer's inference that underground tree roots could cause disruption of the ISDS without being seen is not clearly erroneous or capricious.
This Court "may not substitute [its] own Judgment for that of the hearing officer in situations in which the judgment of the hearing officer was supported by the record." Id. The hearing officer's decision in the instant case was in accordance with the evidence of record. Both affirmative evidence from DEM's expert and the absence of evidence from the plaintiff indicated that the proposed ISDS would be contrary to the public health and environment. A variance request shall be denied when "[t]he evidence indicates that the approval of the system would otherwise be contrary to the public health, the public interest, or environmental quality." ISDS Regulation 20.02(b)(3).
This Court need not analyze whether the enforcement of the ISDS has resulted in an unnecessary hardship, as the plaintiff failed to prove that his proposed system would not be contrary to the public health and environment. The plaintiff must carry his burden of proof on all three factors listed under ISDS Regulation 21.02. Because the hearing officer had competent evidence of record to find that the plaintiff had not proven that his proposed ISDS would not be contrary to the public health and environment, this Court must uphold the agency's decision. RhodeIsland Public Telecommunications Authority, 650 A.2d at 485. An analysis of the "unnecessary hardship" standard is not required, because the hearing officer had substantial evidence for his decision on public health and environmental grounds. SeeStrafach. 635 A.2d at 283.
 Takings Clause
The plaintiff argues that DEM has effectuated a taking of his land by denying him an ISDS permit. The plaintiff asserts that DEM's actions have violated the 5th and 14th amendments of the United States Constitution and Art. I, Sect. 16 of the Rhode Island Constitution by depriving him of the beneficial use of his land without just compensation. The plaintiff states that his land has no beneficial value without an ISDS permit. The plaintiff also asserts that changes in DEM regulations have effectuated a taking, as the plaintiff's proposed setbacks would have been valid under previous DEM regulations.
The DEM argues that the plaintiffs inverse condemnation claim is not properly before the Court. The DEM states that there is not an adequate factual predicate for the court to determine whether the plaintiff has lost all beneficial use of his property. The DEM argues that the plaintiff may not bootstrap an inverse condemnation action to an administrative appeal. Even if the inverse condemnation is properly before the court, DEM states that the plaintiff has not been deprived of all beneficial use of his property, as he has not explored all alternatives for the use of his property under the zoning ordinance.
In analyzing an inverse condemnation claim, the court must determine "(1) [t]he economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action." Alegria v. Keeney,687 A.2d 1249, 1252 (RI. 1997) (citing Penn Central TransportationCo. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). "[R]egulations that compel the property owner to suffer a physical invasion of his property and regulations that deny all economically beneficial or productive use of land" merit compensation "without case specific inquiry into the public interest advanced in support of the restraint."Id. (citing Lucas v. South Carolina Coastal Council,505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992)). In order for the court to decide an inverse condemnation claim, there must be an adequate factual predicate for the issue on the record. Landfill Resource v. Dept. of Env. Management,512 A.2d 866, 869 (R.I. 1986). If there is an inadequate factual predicate, the plaintiff may pursue the inverse condemnation claim in a separate evidentiary proceeding. See Alegria, 687 A.2d at 1251 (after denying an applicant's administrative appeal, the Superior Court allowed the applicant to file an amended appeal for a separate trial on the "takings" issue).
This Court need not decide the plaintiff's inverse condemnation claim at this time because there is an inadequate factual predicate for the claim on the record. The plaintiff admitted that he had not checked the Jamestown Zoning Ordinance to explore other uses for the property. This fact alone indicates that more evidence is needed on the issue of whether the plaintiff has been denied all economically beneficial use of his land. In addition more evidence must be put forth on the economic impact of DEM's denial of the application and the extent to which DEM's action has interfered with the plaintiffs investment expectations for the property.
 Evidentiary Rulings
The plaintiff argues that the hearing officer committed reversible error on several evidentiary rulings. First, the plaintiff argues that the hearing officer erred in permitting Chateauneuf to testify that excessive nitrates in drinking water will cause "blue baby" syndrome. The plaintiff states that Chateauneuf was not qualified as an expert in public health matters.
"It is well-settled law that the qualifications of an expert witness and the matters to which he or she may testify are considered to be within the sound discretion of the trial justice." Owens v. Payless Cashways, Inc., 670 A.2d 1240, 1244 (R.I. 1996). "The controlling inquiry is whether the proffered expert is qualified by virtue of his or her `knowledge, skill, experience, training, or education' to deliver a helpful opinion to the jury." Id.
The hearing officer qualified Chateauneuf as an expert "in the field of engineering, ISDS design, ISDS construction and the application of the ISDS regulations." (Tr. March 7, 1994 at 34). Chateauneuf testified that he had worked for an environmental consulting film on projects in which he tested groundwater for contaminants and determined whether the groundwater was suitable for a municipal water supply. (Tr. March 7, 1994 at 21). Chateauneuf also testified that he had served as director for Warwick's water department and public works department. At the time of the hearing, Chateauneuf was chief of the groundwater and ISDS division for DEM.
This Court finds that Chateauneuf was qualified to testify that excessive levels of nitrates in drinking water had been known to cause "blue baby" syndrome. As incidental to his expertise on groundwater contaminations and septic systems, Chateauneuf was qualified to point out one of the dangers involved from nitrates flowing from an ISDS into the drinking water supply. The Court in Owens emphasized that "[t]he analysis [of qualifications, does not necessarily turn on a proffered witness's title or some license that he or she may hold." Id. In addition to being a civil engineer, Chateauneuf had extensive experience in groundwater quality and its suitability for drinking water. Even if this court excluded the testimony on "blue baby" syndrome, such an exclusion would not warrant reversal. The hearing officer still had competent evidence that nitrates are a dangerous contaminant to the drinking water supply. There was also evidence of record indicating a risk for ISDS effluent to travel directly into ground drinking water. Additionally, the record revealed an absence of evidence on the part of the plaintiff to demonstrate that the ISDS would not be contrary to the environment and public health.
Next, the plaintiff argues that the failure of the hearing officer to draw an adverse inference from DEM's decision not to call two witnesses listed in the pre-trial memorandum constituted an error of law. "[A] litigant's unexplained failure to produce an available witness who would be expected to give material testimony in the litigant's behalf permits, but does not compel, a factfinder to draw an inference that had the witness testified, the testimony would have been adverse to the litigant." Belangerv. Cross, 488 A.2d 410, 412-413 (R.I. 1985).
Under Belanger, the hearing officer was not required to draw an adverse inference. The hearing officer noted that the proposed testimony of the witnesses not called was merely cumulative. Under Rule of Evidence 403, evidence may be excluded if it is needlessly cumulative. The hearing officer did not commit an error of law in failing to draw an adverse inference. Furthermore, our Supreme Court has noted that "[a]n expert administrative tribunal concerned with advancing the public welfare should not be rigidly governed by rules of evidence designed for juries." DePasquale v. Harrington, 599 A.2d 314, 317 (RI. 1991).
The plaintiff additionally argues that the hearing officer erred in not allowing his attorney to withdraw as the plaintiffs counsel in order for the plaintiff's attorney to testify as to what was said at a meeting between the plaintiff and DEM officials on March 9, 1993. Generally, an attorney may not act in the dual capacity as both lawyer and witness at trial. Vierra v.R.I. Mun. Police Academy, 539 A.2d 971, 973 (RI. 1988); Rules of Professional Conduct Rule 3.7. However, if the attorney is not a "necessary witness," it is not essential to the proceedings that the attorney withdraw. See State v. Usenia, 599 A.2d 1026, 1030-1031 (R.I. 1991) (prosecutor was not disqualified from the matter, as the defendant could cross-examine the police officer and other witnesses instead of the prosecutor, to elicit the same testimony).
In the instant case, the testimony of the plaintiff's counsel was not necessary to the proceedings. The plaintiff admitted that he was present at the March 9, 1993 meeting, along with his attorney. Any testimony required to refute Chateauneuf's understanding of what was said at the meeting could have been received from the plaintiff himself. In fact the plaintiff did testify that he was led to believe at the meeting that if the well owners did not agree to the well testing, those owners' objections would have no merit. The plaintiff's counsel could have followed up with further questioning of the plaintiff about the meeting or even recalled the plaintiff as a witness later on.
The hearing officer acted well within his discretion to refuse to permit the plaintiff's counsel to withdraw. The plaintiff's counsel could offer no more information about the meeting than the plaintiff himself. The exclusion of possible testimony by the plaintiffs counsel was proper on the grounds that such evidence would have been cumulative and involve undue delay in the proceedings. Rule of Evidence 403.
Finally, the plaintiff argues that the hearing officer impermissibly allowed Chateauneuf to answer hypothetical questions without the requisite foundation for those questions. The plaintiff states that these impermissible answers occurred throughout the examination of Chateauneuf. "It is well-established in this jurisdiction that the admission of a hypothetical question ordinarily rests in the sound discretion of the trial justice, and his or her rulings thereon will not be disturbed by [a] court on appeal except for an abuse of such discretion." State v.Capalbo, 433 A.2d 242, 247-248 (R.I. 1981). "[A] hypothetical question not based on facts in evidence would be inadmissible and to allow it would be a clear abuse of discretion." Araujo v.Technical Casting Co., 100 R.I. 90, 211 A.2d 645, 648 (1965). The appellant must point out with specificity how the hearing officer abused his discretion and wherein the appellant was prejudiced. See State v. Thornley,113 R.I. 189, 319 A.2d 94, 97 (1974).
This Court notes that the plaintiff has only generally objected that Chateauneuf answered hypothetical questions without foundation. The plaintiff has not directed the court's attention to specific questions and specific foundational errors. "The objection that no foundation was laid for the testimony is too indefinite to raise any question for determination." Russell v.Pitts, 123 S.E.2d 708, 710 (Ga. App. 1961). However, this Court in reviewing the record did not find any hypothetical questions which were not based on facts in evidence. The hearing officer did not abuse his discretion in allowing Chateauneuf to answer the hypothetical questions posed by DEM's attorney.
After review of the entire record, this Court finds that DEM's denial of the plaintiffs application to install an ISDS and denial of the plaintiff's requested variances were not in violation of statutory provisions, were not in excess of its statutory authority, were made upon lawful procedure, and were not clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. The DEM's actions were not arbitrary, v or capricious or characterized by an abuse of discretion. The DEM's decision was constitutional; plaintiff may pursue his takings claim in subsequent proceedings. Accordingly, the plaintiff's appeal is denied, and the decision of the hearing officer is affirmed.
Counsel shall prepare the appropriate judgment for entry.