650 A.2d 479 (1994)
RHODE ISLAND PUBLIC TELECOMMUNICATIONS AUTHORITY et al.
v.
RHODE ISLAND STATE LABOR RELATIONS BOARD et al.
No. 93-268-M.P.
Supreme Court of Rhode Island.
December 2, 1994.
*482 William G. DeMagistris, Providence, for plaintiff.
Thomas S. Hogan, Hogan & Hogan, East Providence, for defendant R.I. State Labor Relations Bd.
Richard Skolnik, Skolnik, McIntyre & Tate Ltd., Providence, for defendant R.I. Dept. of Educ. Professional Employees Ass'n, AFT Local 2012.

OPINION
LEDERBERG, Justice.
This case came before the Supreme Court on a petition for certiorari to review the judgment of the Superior Court that affirmed a decision of the Rhode Island State Labor Relations Board (board). The board had ruled that two "associate producer" positions existed within the state's public television station, and that those positions should be included within the station's certified collective-bargaining unit. For the reasons stated below, we grant the petition and quash the judgment of the Superior Court.

FACTS ON THE RECORD AND PROCEDURAL HISTORY
The petitioners in this case are the Rhode Island Public Telecommunications Authority (hereafter the Authority or channel 36), the Rhode Island Board of Governors for Higher Education, and the Rhode Island Board of Regents for Elementary and Secondary Education. These three agencies employ professional and administrative employees who are organized for collective-bargaining purposes within a single bargaining unit, the Rhode Island Department of Education, Professional Employees Union, American Federation of Teachers, Local 2012, AFL/CIO (hereafter the union or local No. 2012). The respondents in this case are the union and the board.
On March 31, 1988, the union filed a unit-clarification petition with the board pursuant to the Rhode Island Labor Relations Act, G.L. 1956 (1986 Reenactment) § 28-7-9(b)(3)(A), as amended by P.L. 1987, ch. 495, § 1. The petition asked the board to clarify two positions of employment at the Authority, which operates WSBE-TV Channel 36, a public television station, pursuant to G.L. 1956 (1988 Reenactment) § 16-61-6(d). The union asked the board to determine whether the positions, called associate producers, should have been included in the union's existing bargaining unit as defined by the *483 board's 1969 classification of positions included in the unit (case No. EE-1854).
The board held formal hearings from October 12, 1988, through February 26, 1990, during which both sides presented testimony. The union argued that the position of associate producer was permanent and protected by G.L. 1956 (1984 Reenactment) chapter 11 of title 36, which governs the organization of state employees. Consequently, the union argued, the positions should be included within the certified-bargaining unit of state employees.
The union presented as witnesses two employees who each held the title of associate producer. Phase Plushner (Plushner) began working at channel 36 in January 1984 as an unpaid intern for "Tuesday Nights," a program used as a vehicle for training students and interns. Although Plushner initially requested a position at the station, she accepted the unpaid internship after she was informed that no employment was available. After two or three months, she began to receive a minimum-wage salary but never received benefits of any kind. She worked approximately ten hours each week at the beginning of her internship, and after about a year she began to work up to thirty-five hours a week, ten to twenty-five hours of which were performed outside the station.
During the time she worked at the station, Plushner continued to express interest in a full-time position at the station, but none became available. She was, however, offered two full-time positions at another commercial television station during the time she worked for channel 36. To the surprise of channel 36's production manager Leroy Czaskos (Czaskos), she turned the offers down because the work schedule was not acceptable to her. Although she attempted to move to a full-time position at channel 36, Plushner was never hired for a position other than the internship, and she received no formal notification that her job title had changed.
Plushner contended, however, that the substantive duties she performed changed from those she was hired to perform as an intern. Although she was unable to point to an exact, or even an approximate, date on which her transmutation from intern to associate producer occurred, Plushner testified that she eventually stopped performing internship duties, such as typing and floor directing, and began to "supervise" other interns, to develop ideas for shows, and "pretty much put the ['Tuesday Nights'] show together" by herself. These new duties were unsupervised and were usually initiated by Plushner.
Eventually, the closing credits of "Tuesday Nights" listed Plushner not as a production assistant but as an associate producer. Letters of recommendation written by station personnel for Plushner call her an associate producer, and an interoffice memo refers to her as a "producer."
The second employee who testified before the board was Leslie Parks (Parks), who was hired by channel 36 in October 1986 after working as the creative-service director of a radio station in New London, Connecticut. Just as Plushner had, Parks obtained her position by approaching Czaskos and asking for a position. Parks accepted the position of associate producer, and testified that Czaskos felt she was overqualified for the position. Parks further testified that she would not have considered an internship because, at that point, she had already been out of school for fifteen years. During her tenure at channel 36, Parks was never referred to as an intern. Her job duties included booking and preparing for the "Tuesday Nights" program and recording "on the street" interviews. Parks testified that she "directed" other interns and informally evaluated their performance for the station. Like Plushner, however, she never received more than minimum wage, nor did she receive employee fringe benefits.
At the hearing before the board, the Authority's description of Parks's and Plushner's activities at the station differed substantially from that provided by Parks and Plushner. Czaskos testified for the Authority that the position of associate producer never existed, that the employees in question were intern trainees, and that use of the term "associate producer" in referring to these positions was not evidence of an actual position, but rather a longstanding form of *484 professional courtesy for interns in the broadcast industry. The Authority further argued that the references to associate producer, particularly in respect to Plushner, were consistent with a cosmetic attempt to describe the functional activities of interns.
The Authority also introduced as evidence pay records that listed the minimum-wage compensation for all intern trainees under the heading "student assistants," a listing that included the compensation of Plushner, Parks's and other student and nonstudent workers. In addition to Plushner's and Parks's testimony that at no time did they receive more than minimum wage and never received benefits, the Authority also noted that both Parks and Plushner worked on the "Tuesday Nights" program, channel 36's vehicle for training interns.
The Authority noted that under § 16-61-6(o), the station is directed to conduct "training in matters related to public broadcasting and public broadcasting telecommunications in the state, directly; or through contracts with appropriate agencies, organizations or individuals." In fulfilling this responsibility, the Authority produced evidence that since 1967 it has conducted internship programs that have provided opportunities for training in public broadcasting, following which, the interns were expected to move on to other endeavors. The Authority argued that the positions in dispute were part of such a training program and that even if some interns were associated with the production of a program, their actual positions as interns did not, over time, become transformed into collective-bargaining positions at minimum wage and no benefits.
Czaskos also testified that during the entire duration of the internship program, the union never petitioned to represent interns, nor had it filed an unfair-labor-practice charge contending that interns were performing the duties of bargaining-unit members. The union president testified that the 110 to 112 members of local No. 2012 worked a thirty-five-hour week, and as of fiscal year 1990, earned salaries ranging from $20,045 to $49,952, substantially more than Parks and Plushner, who were paid minimum wages with no benefits.
Moreover, the union had never received, as was required for positions in the collective-bargaining unit, postings of the putative associate-producer positions before they were filled. Neither had the union ever filed a grievance claiming that the contract had been violated for failure to post the positions before they were filled.
Plushner contacted the union before March 1988 and stopped working at the station in July 1988. Parks testified that she was fired from her position at channel 36 in April 1988.
On December 21, 1990, the board found that Plushner occupied the position of associate producer at channel 36 from April 1984 to July 1988 and that this position had been created by the Authority and had been given to her. The board also found that Parks had been hired as an associate producer and held this position until her employment ended in April 1988. Further, the board concluded that both Parks and Plushner were state employees under chapter 11 of title 36 and that because the positions they occupied shared a community of interest with the other employees in the bargaining unit, their positions as associate producer were appropriate for inclusion in the unit for the purposes of collective bargaining.
The Authority appealed the board's decision to the Superior Court pursuant to G.L. 1956 (1993 Reenactment) § 42-35-15. On April 23, 1993, the Superior Court affirmed the decision of the board, and on May 13, 1993, the Authority filed a statutory petition for certiorari pursuant to § 42-35-16. This court issued the writ on September 29, 1993.

THE STANDARD OF REVIEW
In Environmental Scientific Corp. v. Durfee, 621 A.2d 200 (R.I. 1993), this court pointed out that the scope of our review, like that of the Superior Court, is an extension of the administrative process. Id. at 208; see Strafach v. Durfee, 635 A.2d 277, 280 (R.I. 1993). Under the terms of the Rhode Island Administrative Procedures Act (APA), § 42-35-15, judicial review is restricted to questions that the agency itself might properly entertain. Environmental Scientific Corp., 621 A.2d at 208. The Superior Court is *485 limited to an examination of the certified record to determine whether the agency's decision is supported by any legally competent evidence in the record. Id.; Barrington School Committee v. Rhode Island State Labor Relations Board, 608 A.2d 1126, 1138 (R.I. 1992).
In the event competent evidence exists in the record, the Superior Court is required to uphold the agency's conclusions. Id.
"However, it may reverse, modify, or remand the agency's decision if the decision is violative of constitutional or statutory provisions, is in excess of the statutory authority of the agency, is made upon unlawful procedure, is affected by other errors of law, is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record, or is arbitrary or capricious and is therefore characterized by an abuse of discretion. Section 42-35-15(g)." Id.

In the case before us, the Superior Court examined the certified record and determined that the board's decision was not subject to reversal or modification. In finding that there existed competent, probative evidence to support each of the fourteen findings made by the board, the trial justice noted that the scope of his review was restricted by the procedural limitations of the APA. We have held that in reviewing a decision of an administrative agency under the APA, the Superior Court may not, on questions of fact, substitute its judgment for that of the agency whose action is under review. Lemoine v. Department of Mental Health, Retardation and Hospitals, 113 R.I. 285, 291, 320 A.2d 611, 614-15 (1974). This limitation obtains even in situations in which the court might be inclined to view the evidence differently and draw inferences different from those of the agency under review. Barrington School Committee, 608 A.2d at 1138. Given these limitations, the trial justice noted in affirming the board: "Admittedly, the evidence relied upon by the Board does permit contrary inferences to be drawn therefrom, but this Court is prohibited * * * from drawing same. This Court * * * cannot substitute its judgment on the evidence even though it might be inclined to view that evidence differently than did the Board." Accordingly, the Superior Court affirmed the board's decision.
Under the APA, this court's review of the Superior Court's final judgment in proceedings brought under § 42-35-15 is confined to a review of "any questions of law involved," § 42-35-16, as this court carries out its role as an extension of the administrative process. Environmental Scientific Corp., 621 A.2d at 208. In conducting our review, "we must examine the record of the Superior Court to see whether the court concluded properly that the labor board's ruling was [supported] by substantial evidence on the record." Barrington School Committee, 608 A.2d at 1138. We do not weigh the evidence but merely ascertain whether the court was justified in rendering its judgment. Id. Because we retain the power to review all questions of law, § 42-35-16, this court is permitted to determine whether legally competent evidence justifies the conclusions of the Superior Court and the board. Barrington School Committee, 608 A.2d at 1138. "Legally competent evidence is indicated by the presence of `some' or `any' evidence supporting the agency's findings." Strafach, 635 A.2d at 280 (quoting Environmental Scientific Corp., 621 A.2d at 208). If we conclude that such evidence is absent, the "administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record." Environmental Scientific Corp., 621 A.2d at 208 (quoting Costa v. Registrar of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988)). We now turn to an examination of the judgment of the Superior Court.

ANALYSIS
We note at the outset that this court has not previously addressed the issue of adding new employees to an already existing certified-bargaining unit absent a unit election. In attempting to use federal labor practice for guidance  as we did in Barrington School Committee, 608 A.2d at 1135 (following federal practice of holding that managerial employees may not engage in collective bargaining)  our review of Federal Circuit *486 cases and decisions of the National Labor Relations Board (NLRB) pursuant to the National Labor Relations Act, 29 U.S.C. § 159 (1988), reveals no example of a purported transformation of an excluded nonunion employee into a bargaining-unit employee absent some action on the part of the employer. Even without the guidance of federal precedent, however, the evidence adduced at trial demonstrated that Parks's and Plushner's work was not so clearly integrated with that of the employees in the existing bargaining unit as to warrant their addition to the unit.

DETERMINING MEMBERSHIP IN A BARGAINING UNIT
When determining the membership of units for collective-bargaining purposes, the NLRB has as its primary concern the grouping together of "only employees who have substantial mutual interests in wages, hours, and other conditions of employment." Fifteenth Annual Report of the NLRB, 39 (1950). The "community of interest" doctrine, N.L.R.B. v. George Groh and Sons, 329 F.2d 265, 268 (10th Cir.1964), is used by the NLRB to determine whether certain employees in a unit are sufficiently concerned with the terms and conditions of employment as to warrant their participation in the selection of a bargaining agent. Id. In making such a determination, the board is not required to choose the most appropriate bargaining unit but only an appropriate bargaining unit. Wil-Kil Pest Control Co. v. N.L.R.B., 440 F.2d 371, 375 (7th Cir.1971). Specific factors that are relied upon by the NLRB in determining whether such a community of interest exists have been identified in N.L.R.B. v. Saint Francis College, 562 F.2d 246, 249 (3d Cir.1977). These criteria are:
1. Similarity in scale and manner of determining earnings,
2. Similarity of employment benefits, hours of work, and other terms and conditions of employment,
3. Similarity in the kind of work performed,
4. Similarity in the qualifications, skills, and training of the employees,
5. Frequency of contact or interchange among employees,
6. Geographic proximity,
7. Continuity or integration of production processes,
8. Common supervision and determination of labor relations policy,
9. Relationship to the administrative organization of the employer,
10. History of collective bargaining,
11. Desires of the affected employees, and
12. Extent of the union organization.
Id. (citing Robert A. Gorman, Basic Text on Labor Law, Unionization, and Collective Bargaining, 69 (1976)).

ACCRETION AND COMMUNITY OF INTEREST
Once an appropriate unit for collective-bargaining purposes has been established, groups of new employees, or present employees in new positions, can be added to the existing unit without a vote on their representation through a process known as accretion. N.L.R.B. v. Stevens Ford, Inc., 773 F.2d 468, 472-73 (2d Cir.1985). Accretion preserves stability by allowing adjustments in bargaining units to accommodate new conditions without requiring an adversary election every time new jobs are created or industrial routines are altered. Id. at 473. In determining whether an accretion of employees to an existing unit is proper, the NLRB considers many of the same factors that determine the community-of-interest question, namely, such factors as integration of operations; centralization of managerial and administrative control; geographic proximity; similarity of working conditions, skills, and functions; common control over labor relations; collective-bargaining history; and interchangeability of employees. N.L.R.B. v. Security-Columbian Banknote Co., 541 F.2d 135, 140 (3d Cir.1976). Thus, accretion serves as a mechanism to incorporate a group of employees into an already existing larger unit when such a community of interest exists among the entire group that the additional employees have no separate unit identity and therefore should properly be *487 governed by the larger group's choice of bargaining representatives. Id.
Although accretion and unit determination are similar concepts, accretion has been used sparingly because it denies the accreted employees a vote on their choice of bargaining representative. Id. The NLRB's hesitancy in using the accretion doctrine rests on the inherent competing policy considerations in the accretion doctrine: stability of labor relations versus the employees' freedom to choose their own bargaining agents. International Association of Machinists and Aerospace Workers, Local 1414 v. N.L.R.B., 759 F.2d 1477, 1480 (9th Cir.1985).
In the instant case the board ruled that Parks and Plushner had accreted to the bargaining unit because the two workers shared a sufficient community of interest with the other employees of the bargaining unit. We disagree.
As noted above, we find no instance in which employees have accreted into the pre-existing bargaining unit primarily on the basis of the employees' perceptions of their job duties. Although case law does address the issue of whether employees promoted to new positions with different responsibilities were properly included in an existing unit, those cases are not dispositive of the issues before us. See generally Westinghouse Electric Corp. v. N.L.R.B., 440 F.2d 7, 10 (2d Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 93, 30 L.Ed.2d 93 (1971) (addressing whether employees promoted from technical to analyst positions were no longer qualified to be included in the technical unit). In the instant case it was the workers who claimed that their positions were modified  not by an affirmative act on their employer's part, but rather by their own subjective perceptions of their jobs. Such an argument is unpersuasive and unavailing.
Applying the community-of-interest standards and factors pertaining to accretion, we are led to the conclusion that Parks and Plushner did not share "mutual interests in wages, hours, and other conditions of employment" with the members of the union. Members of local No. 2012 for fiscal year 1990 earned between $20,045 and $49,952, received full state-employee health benefits, most participated in the State Employees Retirement System, and typically worked thirty-five hours each week at the station. Employees in the local No. 2012 bargaining unit were required to apply for and compete with other qualified candidates in the hiring process delineated in the union's collective-bargaining agreement; the agreement requires posting of vacant positions, subject to affirmative action and other regulations.
None of these fundamental characteristics of bargaining-unit positions applied to Plushner or Parks. Both received minimum-wage salaries, and neither received any form of employee benefits. Plushner worked only ten to thirty-five hours per week at the station. Both individuals worked on the "Tuesday Nights" program, which was the training program for interns. Both were hired not through the normal procedure listed in the collective-bargaining agreement, but through an ad hoc, self-initiated solicitation.
In presenting its evidence before the board, the union stressed the differences between Parks and Plushner's activities and those of the other interns. An argument for accretion, however, must rest on the identification of sufficient similarities between the group hoping to join the bargaining unit and the members already in the unit. Accretion is not a consequence of the dissimilarities between the group hoping to join  here, the two workers  and those excluded  the other interns. Because of this misdirected emphasis, the union presented no evidence before the board that proved aspects of the community-of-interest standard. For example, the union did not present testimony from members of the bargaining unit delineating their commonality of interest with Parks and Plushner. Thus, we are left solely with the testimony concerning wages, hours, benefits, and the method of hiring. These factors conclusively show that Parks and Plushner and the members of local No. 2012 did not share "substantial mutual interests in wages, hours, and other conditions of employment," insofar as Parks and Plushner were employed at minimum wage and received no benefits.
*488 The board found that Parks and Plushner shared a community of interest with the other members of local No. 2012 because their positions of employment were "similar to" those of other employees in the bargaining unit. The station positions listed in the 1969 certification included chief engineer, program directors, art director, instructional television coordinator, producer-director, television director, and director of community relations & station development. These highly technical and specialized positions do not comport with the amorphous associate-producer position, which required neither formal training, nor specialized knowledge or educational requirements.
The board also found that Parks and Plushner were associate producers and, therefore, appropriate members of the bargaining unit because the associate-producer position was listed by the Authority as a separate category from intern on a 1988 organizational chart. The board found this listing an especially persuasive indication of the status of Plushner and Parks. The chart, however, lists numerous positions that are not contained in the collective-bargaining agreement. The positions so identified include on-air talent, production trainees, principal clerk/typists, and promotion trainees. Thus, the organizational chart, so heavily relied upon by the union and the board, is primarily a descriptive representation of the hierarchy at the station and of job responsibilities, not a listing of positions within the bargaining unit.
Because we conclude that Parks and Plushner were essentially employed as interns, we hold that the board erred in finding that Parks and Plushner had a community of interest with the members of local No. 2012. We base this conclusion on three factors: the history of collective bargaining; past decisions of the NLRB; and previous arbitration awards in this state.
A unit's collective-bargaining history is used by the NLRB as a factor in determining whether a community of interest exists as well as whether a particular group of employees should accrete to an existing collective-bargaining unit. See St. Francis College, 562 F.2d at 249 (one factor in community-of-interest determination is history of collective bargaining); Security-Columbian Banknote Co., 541 F.2d at 140 (history matters as a factor in accretion determination). At oral argument, counsel for the union stated that its goal in bringing the petition was to obtain an administrative clarification that these two positions existed and should properly be included in the union's certified-bargaining unit. Czaskos testified before the board that production interns had been employed by the station for twenty-two years and that they performed essentially the same duties as Parks and Plushner. At no time during these twenty-two years had the union petitioned to organize or accrete any intern position, and the union conceded before the board that it was not petitioning to represent trainees.[1] The fact that the internships listed by the Authority predated the collective-bargaining agreement of 1969 is significant: *489 "Another [accretion] factor  one which is often dispositive  is whether the group to be accreted was in existence at the time the existing bargaining unit was recognized. If the group was in existence and excluded from an election, then accretion should not normally be permitted." (Emphases added.) Stevens Ford, Inc., 773 F.2d at 474. Here, the Authority produced evidence of interns at the station in 1967, two years before the unit was formed, and thus interns are properly excluded.
In addition, arbitration awards in this state have ruled that individuals who are involved in training programs are not state employees for collective-bargaining purposes. In In re State of Rhode Island Department of Social and Rehabilitative Services and Rhode Island Council 94, AFSCME, Local 2882, Case No. 1139-1393-83 (1984) (Fallon, Arb.), the union contended that the state had violated a contract provision that precluded non-bargaining-unit employees from performing bargaining-unit work. The arbitrator concluded that the trainees involved in the WIN program were not "employees" within the meaning of the contract and noted that the trainees were "not hired through regular hiring procedures, receive[d] no standard fringe benefits, and [were] paid * * * an amount so small that it cannot reasonably be called a salary comparable to [s]tate employee wages." Id. at 11. Every aspect of the arbitrator's reasons for classifying the WIN trainees as nonemployees can be accurately applied to Parks and Plushner, irrespective of whether they were called associate producers.
Thus, the decisions of the NLRB and arbitration awards are persuasive in determining the proper factors for the inclusion of trainees and other educationally based work programs in a bargaining unit. The two positions at issue here shared no community of interest with the members of local No. 2012. To hold otherwise could result in industrious and self-motivated interns claiming the right to be included in collective-bargaining units. Such an outcome would interfere with the Authority's statutory mandate under § 16-61-6(o) to conduct training in public broadcasting.
We conclude, therefore, that the board's decision rested upon an error of law and was clearly erroneous in view of the reliable, probative, and substantial evidence on the record. Because no legally competent evidence existed to support the judgment of the Superior Court, the petition for certiorari is granted. The judgment of the Superior Court is quashed, and the papers in this case are remanded to the Superior Court with our decision endorsed thereon.
NOTES
[1] We note that attempts to organize or classify work-study students as state employees have failed in the past, largely for the same reasons: differences in wages, hours, and conditions of employment. In In re R.I. Council 94, AFSCME, Local 2879 and State of Rhode Island, Case No. 1139-2298-82 (1985) (Jerue, Arb.), a union attempted to have work-study students at Rhode Island College barred from performing bargaining-unit work in violation of the contract. The arbitrator held that the longstanding work-study program did not violate the contract, partly because "[t]heir compensation is considerably less than regular state employees." Id. at 5.

The decisions of the NLRB also consistently exclude student trainees from collective-bargaining units where there is a substantial difference in pay and wages. In Pawating Hospital Association, 222 N.L.R.B. 672 (1976), the NLRB excluded part-time students employed at a hospital through a school program from a bargaining unit on the basis that the students were "paid lower wages than the Employer's other employees * * *, work different hours, and receive no fringe benefits." Id. at 673. Likewise, in Barnard College, 204 N.L.R.B. 1134 (1973), the NLRB excluded a group of university students who worked as graduate assistants and part-time support staff, from a unit containing clerical and administrative staff employees. In doing so, the NLRB noted that "the student employees are treated differently in a number of significant ways, especially with respect to their initial employment, rates of pay, tenure, and other employment conditions." (Emphasis added.) Id. at 1135. In both of these cases, the NLRB ruled that the student employees did not share a community of interest with the bargaining unit.