**Supreme Court**

No. 2013-76-M.P.

(PC 10-404)

Power Test Realty Company Limited     :
Partnership

v.     :

Janet Coit, in her official capacity as     :
Director of the Rhode Island Department of
Environmental Management.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Power Test Realty Company Limited     :
Partnership

v.                :

Janet Coit, in her official capacity as     :
Director of the Rhode Island Department of
Environmental Management.[1]

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Indeglia, for the Court.** The discovery of petroleum in groundwater has led to a dispute that has brought the parties before this Court. This case comes before us pursuant to a writ of certiorari filed by Power Test Realty Company Limited Partnership (Power Test), whereby it sought relief from a Superior Court judgment that affirmed the final decision of the Department of Environmental Management (DEM or department) in a contested enforcement action. Power Test contends that the Superior Court erred in imposing liability upon it because: (1) there was no evidence that it caused the discharge of petroleum; (2) the evidence demonstrating that it had knowledge of the leaching petroleum was insufficient to cloak it with liability; and (3) it owns only a portion of the contaminated site and there was no evidence that the petroleum on a nearby parcel originated from the Power Test property. For the reasons set

---

[1] Since the origination of this case, Janet Coit replaced W. Michael Sullivan as director of the Rhode Island Department of Environmental Management. Thus, she has been substituted as a party and the case caption has been modified to reflect this change.

forth herein, we affirm the judgment of the Superior Court and quash the writ of certiorari heretofore issued.

# I

## Facts and Travel

The facts of this case are largely undisputed, gleaned predominantly from the stipulation of facts before the DEM hearing officer. Power Test is the owner of property located at the intersection of Dunellen Road and Dexter Road in East Providence, Rhode Island, more precisely identified as East Providence Assessor's Map No. 204, Block No. 1, Parcels No. 9 and 11 (the Power Test property). There are four pipelines installed in and below the Power Test property, which are owned by Getty Properties Corporation (GPC)[2] and operated by Getty Petroleum Marketing, Inc. (GPM).[3] Power Test neither owns nor operates any of the pipelines. In 1975, two of the four pipelines were shut down, capped off, and filled with "slurry," rendering them inactive. The two remaining pipelines (the active pipelines) were operated by GPC from 1975 until March 1997, when GPM took over operation until April 2003. The active pipelines were used to transport unleaded refined gasoline, No. 2 home heating fuel oil, and diesel fuel.

Groundwater monitoring well OW-0102A is positioned in Dunellen Road, which is located between Parcel No. 15 to the north and Power Test's Parcel No. 11 to the south. Parcel No. 15 is owned by Capital Terminal Company, Inc. (CTC). On March 22, 2002, Pare Engineering Corporation, a consultant to CTC, observed a petroleum substance, known as Light Non-Aqueous Phase Liquid (LNAPL), in groundwater monitoring well OW-0102A.

---

[2] Notably, GPC is the general partner of Power Test.
[3] GPC operated these active pipelines from 1985 to 1997, when their operation was taken over by GPM. GPM shut down operation of the active pipelines in 2003.

As a result of this detection, in early April 2002, GPM hired Tyree Organization Ltd. (Tyree) to conduct excavation activities along the pipeline easement in Parcel No. 11 to investigate the potential for a release of LNAPL from its pipelines. During these excavation activities, all pipelines were found to be in excellent condition, with no visible signs of corrosion or pitting. In addition, there was no staining and no olfactory or visible evidence of any release found beneath the exposed portions of the active pipelines. The active pipelines were also subjected to pressure tests and, after the pipelines passed these tests, DEM granted GPM the approval to recommence use of the pipelines. In addition, a set of tests were conducted by two separate environmental entities, whereby samples of LNAPL from monitoring well OW-0102A were collected and compared to gasoline samples from the GPM bulk storage tank that fed the active pipelines. The results from both entities demonstrated that the samples collected from monitoring well OW-0102A were "distinctly different" from the gasoline samples collected from the GPM storage tank.

However, GPM was not the only party performing tests as a result of the LNAPL discovery. Vanasse Hangen Brustlin (VHB), another consultant hired by CTC, also tested a sample of petroleum product taken from monitoring well OW-0102A and compiled a report[4] (the VHB report) which it submitted to DEM in September 2002. The appendix to this report indicated that laboratory analysis of the petroleum sample taken from monitoring well OW-0102A indicated that the substance was a weathered leaded automotive gasoline.

Following DEM's receipt of the VHB report, it issued a "Letter of Responsibility" to GPC in December 2002,[5] which indicated that the VHB report identified the GPC pipelines as

---

[4] This report was a public filing to which all parties had access.
[5] Power Test conceded at oral argument that GPM, GPC, and Power Test are all interrelated and that notice to one entity may be construed as notice to all entities.

the "likely source" of the petroleum in the groundwater, classified GPC as a "Responsible Party," and directed GPC to comply with certain remediation regulations. In response, GPC issued a letter to DEM denying liability for the LNAPL pollution, stating that because the active pipelines had been tested and determined to not be the source of the release, it was not in violation of any Oil Pollution Control (OPC) Regulations.[6] On that basis, GPC stated that DEM did not have the authority at that time to require it to engage in the remediation conduct outlined in the letter of responsibility. Thereafter, on July 21, 2003, DEM sent a "Notice of Intent to Enforce" to Power Test, GPC, and GPM. This notice stated that the property remained out of compliance, that the parties were required to comply with certain remediation regulations, and that the failure to comply with such regulations would result in the issuance of a formal enforcement action and the assessment of an administrative penalty.[7]

On July 28, 2005, DEM's Office of Compliance and Inspection issued a "Notice of Violation" (NOV) to Power Test, GPC, and GPM for the detection of LNAPL in the groundwater at the Power Test Property (Parcels No. 9 and 11) and the CTC property (Parcel No. 15), referred to by the NOV as "the Site." The NOV asserted that the parties were in violation of certain provisions of the Rhode Island Water Pollution Control Act (WPA), DEM regulations promulgated thereunder, and DEM Remediation Regulations. The NOV also stated that the parties were in violation of G.L. 1956 § 46-12.5.1-3 of the Oil Pollution Control Act (OPCA) and Sections 6(a) and 12(b) of the OPC regulations. Based upon these violations, DEM ordered Power Test, GPC, and GPM to investigate and remediate the LNAPL detected at the site, and they were assessed a $50,000 administrative penalty.

---

[6] This letter also stated that Power Test was the owner of the pipeline property and that GPM was the operator of the pipelines. The letter did, however, identify Power Test as an affiliate of GPC.

[7] A letter sent to DEM on behalf of GPC and Power Test stated that the parties expected GPM to take primary responsibility for responding to the notice of intent to enforce.

The parties timely appealed the NOV to DEM's Administrative Adjudication Division. After some discovery was conducted and an evidentiary hearing was held, the DEM hearing officer issued a recommended decision that was affirmed as a final decision by the Director of DEM.[8] In his decision, the hearing officer found that there was no evidence that there had been a discharge or release of petroleum from the active pipelines on the site and that the parties did not cause the initial release of the petroleum onto the premises. The hearing officer further found that the petroleum product was "leaching" through a deep aquifer in and below the Power Test property. In addition, the hearing officer found that "[t]he presence of the petroleum product in the groundwater was made known to [Power Test, GPC, and GPM] on or after March 22, 2002." Based upon these findings, among others, the hearing officer dismissed the violations cited under the WPA and the remediation regulations as to all of the parties. In addition, the hearing officer concluded that GPC and GPM were not in violation of the OPCA and OPC regulations.

The same did not hold true for Power Test. According to DEM, the failure of a landowner to remediate oil contamination upon notice of its discovery renders the landowner liable under the OPCA for a continuing discharge regardless of whether the petroleum was released by a prior owner of the property. Accordingly, DEM ordered Power Test to remediate the site—including both the Power Test property and the CTC property—and imposed a $50,000 administrative penalty.

On January 20, 2010, Power Test appealed the DEM decision to the Providence County Superior Court pursuant to the Rhode Island Administrative Procedures Act (APA), G.L. 1956 § 42-35-15(g). After briefing and oral argument, the hearing justice issued a decision in which he

---

[8] An amended recommended decision was affirmed by the Director of DEM on December 23, 2009, which contained a recalculation of the administrative penalty.

determined that the DEM decision was supported by "reliable, probative, and substantial evidence" and was not clearly erroneous, arbitrary, or capricious. In addition, the hearing justice found that the substantial rights of Power Test were not prejudiced. Accordingly, the hearing justice affirmed the decision of DEM. Power Test sought relief from the Superior Court's judgment through a writ of certiorari, which this Court granted on February 12, 2014.

## II

### Standard of Review

The dispute comes before us as a result of our issuance of a writ of certiorari pursuant to § 42-35-16 of the APA, whereby Power Test claims to be aggrieved by a final judgment of the Superior Court in an administrative agency appeal. In accordance with § 42-35-16, our review of the judgment of the Superior Court in administrative proceedings is limited to questions of law. Iselin v. Retirement Board of Employees' Retirement System of Rhode Island, 943 A.2d 1045, 1048 (R.I. 2008). It is well-settled that "questions of law—including statutory interpretation—are reviewed de novo." City of Pawtucket v. Laprade, 94 A.3d 503, 513 (R.I. 2014) (quoting Iselin, 943 A.2d at 1049).

This Court's authority to review questions of law "permits us to determine whether there is any legally competent evidence to justify the conclusions of the reviewing court and agency." Environmental Scientific Corp. v. Durfee, 621 A.2d 200, 208 (R.I. 1993). In so doing, "we must examine the record of the Superior Court to see whether the court concluded properly that [DEM's] ruling was [supported] by substantial evidence on the record." Rhode Island Public Telecommunications Authority v. Rhode Island State Labor Relations Board, 650 A.2d 479, 485 (R.I. 1994) (quoting Barrington School Committee v. Rhode Island State Labor Relations Board, 608 A.2d 1126, 1138 (R.I. 1992)). "We do not weigh the evidence but merely ascertain whether

the court was justified in rendering its judgment." Id. "Legally competent evidence is indicated by the presence of 'some' or 'any' evidence supporting the agency's findings." Id. (quoting Strafach v. Durfee, 635 A.2d 277, 280 (R.I. 1993)). While the factual findings of an administrative agency are afforded great deference, Laprade, 94 A.3d at 513, "an administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record." Environmental Scientific Corp., 621 A.2d at 208 (quoting Costa v. Registrar of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988)).

## III

## Discussion

Before this Court, Power Test asserts three claims of error. First, it claims that the DEM's interpretation of the OPCA is clearly erroneous because—according to Power Test—causation is required under the statute. Second, Power Test asserts that DEM's finding that it had knowledge of petroleum leaching under its property was not supported by the evidence. Last, Power Test claims that it should not be liable for the petroleum under the CTC property because there was no evidence that the petroleum originated from the Power Test property. We address each of these arguments seriatim.

## A

## Causation

### 1. Statutory Interpretation

Power Test asserts that the OPCA does not impose liability upon a landowner that did not cause the initial discharge of contaminants and, thus, DEM's interpretation of the OPCA is clearly erroneous. In support, it contends that the definition of "discharge" requires an entry of oil "into the environment," and that the term "into" can be understood only in the context of an

- 7 -

initial point of contact between the oil and the environment.  In addition, Power Test argues that DEM's interpretation would render the Rhode Island Industrial Property Remediation and Reuse Act (IPRRA) meaningless.  Resting on its own interpretation that it must have caused the initial discharge to be liable, Power Test claims that the determination that it violated the OPCA and OPC regulations was improper based on DEM's factual findings that (i) there was no evidence of a discharge or release of petroleum from the active pipelines on the site, and (ii) Power Test did not cause the initial release of the petroleum onto the premises.

Before scrutinizing the OPCA's prohibition against oil pollution as it might apply to passive conduct, we pause to paint the backdrop against which we conduct our review.  In prohibiting oil pollution via the OPCA, the General Assembly specifically provided that, "[t]he citizens of this state should not have to bear the burdens of the cleanup and the losses of economic livelihood that result from the discharge of oil in any degree[.]"  Section 46-12.5.1-6(a)(2).  The pronouncement of such a policy stems from the Rhode Island Constitution, which provides, in pertinent part, that:

> "[I]t shall be the duty of the general assembly to provide for the conservation of the air, land, water, plant, animal, mineral and other natural resources of the state, and to adopt all means necessary and proper by law to protect the natural environment of the people of the state by providing adequate resource planning for the control and regulation of the use of the natural resources of the state and for the preservation, regeneration and restoration of the natural environment of the state."  R.I. Const. art. 1, sec. 17.

Emanating from this constitutional provision, the OPCA's prohibition against oil pollution combines the need to conserve natural resources and protect the environment with the desire to protect the citizens of this state.

With the stage now set, we begin our analysis of the specific statutory provision at issue. In conducting our review of an administrative agency's interpretation of a statute, we must first

determine whether the statutory provision at issue is clear and unambiguous. Where a statute is clear and unambiguous, the agency is not being called upon to interpret the statute in any respect; thus, our review is de novo. In re Proposed Town of New Shoreham Project, 25 A.3d 482, 504-05 (R.I. 2011). Conversely, "[i]f a statute's requirements 'are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized.'" Duffy v. Powell, 18 A.3d 487, 490 (R.I. 2011) (quoting State v. Swindell, 895 A.2d 100, 105 (R.I. 2006)). At the outset, we note that our review of the statutory framework at issue in this case reveals that one provision is clear and unambiguous, while another is ambiguous; therefore, DEM's interpretation of the ambiguous provision is entitled to deference. We discuss each provision in turn.

The OPCA provides that "[n]o person shall discharge, cause to be discharged, or permit the discharge of oil into, or upon the waters or land of the state except by regulation or by permit from the director." Section 46-12.5.1-3(a). Any person who violates this provision is held strictly liable to the state for such violation. Section 46-12.5.1-3(b). In reading this prohibition, we do not ignore the fact that the Legislature thought it appropriate to prohibit a person from permitting a discharge in addition to prohibiting a person from causing a discharge. We note that "[t]his court has long applied a canon of statutory interpretation which gives effect to all of a statute's provisions, with no sentence, clause or word construed as unmeaning or surplusage." Rhode Island Department of Mental Health, Retardation & Hospitals v. R.B., 549 A.2d 1028, 1030 (R.I. 1988). Because the term "cause" is already explicitly included within the statute, it would be illogical to interpret the term "permit" to also include an element of causation. Rather, contrary to Power Test's assertion, we find it clear and unambiguous that the term "permit" can

be understood to convey a meaning of passive conduct in which a person allows the discharge of oil to occur.[9]

However, the Legislature's use of the passive term "permit" does not end the matter: for liability to follow, the statute also requires the landowner to "permit <u>the discharge</u> of oil." Section 46-12.5.1-3(a) (emphasis added). The OPCA defines discharge as "any spilling, leaking, pumping, pouring, emitting, emptying, releasing, injecting, escaping, leaching, dumping, or disposing into the environment[.]" Section 46-12.5.1-1(9). As we explain below, the OPCA's definition of discharge is ambiguous, in that it is unclear whether the phrase "leaching * * * into the environment" can apply to passive conduct on the part of a landowner.

The hearing justice defined "leaching," in pertinent part, as "the migration of contaminating materials, by rain or groundwater, from a fixed source, such as a landfill." <u>Power Test Realty Co.</u>, No. PC 10-404, 2011 WL3957619, at *5 (R.I. Super. Sept. 1, 2011) (quoting <u>Black's Law Dictionary</u> 969 (9th ed. 2009)). Importantly, this definition does not require any conduct by the landowner. Indeed, contaminants can migrate by rain or groundwater without any involvement by the landowner. We also note that the definition presented requires that the contamination migrate "from a fixed source." Notably, the "fixed source" from which a contaminant flows need not be some man-made structure, such as a pipeline or storage tank. Instead, the landowner's property itself may be the fixed source from which a contaminant migrates, thus "leaching" into another's property.

---

[9] Indeed, the American Heritage Dictionary of the English Language defines the term "permit" (in the pertinent definitional category) as "[t]o allow the doing of (something); consent to[.]" The American Heritage Dictionary of the English Language 1309 (4th ed. 2009). Consequently, the term "permit" encompasses the passive allowance of the discharge of oil. By like token, this definition cannot be interpreted to include an element of causation.

- 10 -

Concluding, as we do, that this statutory provision is ambiguous, we follow the well-settled rule that the construction given by the administrative agency charged with its enforcement—here, DEM—"is entitled to weight and deference;" thus, we will overturn its construction only if "clearly erroneous or unauthorized." Duffy, 18 A.3d at 490 (quoting Swindell, 895 A.2d at 105). The hearing justice, like the DEM hearing officer, interpreted the word "leaching" within the definition of "discharge" to carry a meaning of passiveness, so as to include contaminants moving within and throughout the soil. See Power Test Realty Co., 2011 WL3957619, at *6. The definition of "leaching" upon which the hearing justice relied defined the term as the "process by which moving fluid separates the soluble components of a material * * * [and] is sometimes used to describe the migration of contaminating materials, by rain or groundwater, from a fixed source, such as a landfill." Id. at *5 (quoting Black's Law Dictionary at 969). The hearing justice then found that "contaminants 'leach into'—or 'to the inside of'—the land when they 'passively migrate' within it." Id. at *6. Likewise, the hearing justice determined that leaching into the environment could include passive migration through the soil, regardless of whether that migration originated from within the soil or from some other source of the landowner. Id. In our opinion, the hearing justice's explication of the DEM hearing officer's construction of the statute is sound; thus, we cannot conclude that such construction by the agency is clearly erroneous.

Nevertheless, because the definition of discharge under the OPCA requires that it be "into the environment," Power Test contends that the term "discharge" includes only the initial point of contact between the contaminant and the environment. However, Power Test's narrow view of the phrase "into the environment" forces it to misconstrue the provision as a whole. It is a well-settled principle of statutory interpretation that an isolated part of a particular statute cannot

- 11 -

be viewed in a vacuum; rather, each word and phrase must be considered in the context of the entire statutory provision. See In re Rhode Island Commission for Human Rights, 472 A.2d 1211, 1212 (R.I. 1984) ("[I]n situations in which a particular statutory provision is part of a single statutory scheme, the legislative intent must be gathered from an examination of the entire statute rather than from one part only."). As such, the phrase "into the environment" cannot be interpreted without considering the list of preceding verbs—namely, "spilling, leaking, pumping, pouring, emitting, emptying, releasing, injecting, escaping, leaching, dumping, or disposing * * *." Section 46-12.5.1-1(9). In effect, what we are left to interpret is whether a contaminant can "leach[] * * * into the environment," id., when that contaminant has already escaped its original source and is now present within the soil. While a contaminant that has escaped its original source has moved "into the environment," subsequent movement of the contaminant throughout the soil would also result in the contaminant migrating "into the environment." Thus, we conclude that, within our statutory framework, a contaminant that is present within the soil and continues to migrate throughout the soil is "leaching * * * into the environment."[10] Accordingly, we hold that the Superior Court did not err in determining that Power Test permitted a discharge when a contaminant in and below its property "leach[ed] * * * into the environment."

## 2. The Industrial Property Remediation and Reuse Act (IPRRA)

Power Test also asserts that the Superior Court's interpretation of the OPCA imposing liability without causation was clearly erroneous because it renders the IPRRA's petroleum exclusion meaningless. In support, Power Test contends that the IPRRA imposes strict liability

---

[10] Power Test makes a similar argument with regard to the OPC regulations. Specifically, Power Test claims that Section 5 and Section 6(a) of the OPC regulations prohibit conduct that causes or creates a risk of oil being introduced into the environment. However, as we pointed out in our discussion of the OPCA, we conclude that a contaminant that continues to migrate throughout the soil is progressing "into the environment" and, thus, we find this argument unconvincing.

for a release of hazardous materials, but specifically excludes virgin or unused petroleum from the definition of hazardous materials. According to Power Test, such an exception illustrates a legislative intent to subject nonvirgin or used petroleum releases to liability without proof of causation, while exempting virgin or unused petroleum releases from such a scheme.

The IPRRA holds "responsible parties * * * strictly, jointly and severally liable for the actual or threatened release of any hazardous material * * *." G.L. 1956 § 23-19.14-6(a). In defining "hazardous material," the IPRRA provides: "Hazardous material does not include petroleum for the purposes of this chapter." Section 23-19.14-3(c). Petroleum is defined as "any virgin petroleum product" including, inter alia, "[u]nused distillate and residual oil." Section 23-19.14-3(i).

"It is presumed that the General Assembly knows the 'state of existing relevant law when it enacts or amends a statute.'" Retirement Board of Employees' Retirement System of Rhode Island v. DiPrete, 845 A.2d 270, 287 (R.I. 2004) (quoting Smith v. Retirement Board of the Employees' Retirement System, 656 A.2d 186, 189 (R.I. 1995)). Thus, we presume that, when the General Assembly enacted the OPCA in 1997 (P.L. 1997, ch. 32, §2), it was fully aware that the IPRRA (enacted in 1995 by P.L. 1995, ch. 187, §1), included a provision exempting certain petroleum products from liability. However, rather than implying an element of causation as Power Test suggests, the General Assembly's awareness of the IPRRA merely illustrates that, if it intended to exempt virgin or unused petroleum products from liability without proof of causation in the OPCA, then it would have expressed it as it did in the IPRRA.

Moreover, we note that the Superior Court's interpretation of the OPCA imposing liability without causation does not render the IPRRA's petroleum exclusion meaningless.

- 13 -

Indeed, in enacting the IPRRA, the General Assembly included the following language within the statutory framework:

> "Responsible parties for releases of petroleum are defined as all parties who are otherwise liable for an actual or threatened release of petroleum under any other applicable statute, rule, or common law. This section shall neither be construed as establishing new liabilities or obligations for parties responsible for releases of petroleum that do not otherwise exist under statute, rule, or common law, nor as diminishing any liabilities or obligations that may be established by those provisions. Accordingly, <u>the obligations of the responsible parties for releases of petroleum shall be the same as those provided for under any other application, provisions or rules of law</u>." Section 23-19.14-6.1 (emphasis added).

Thus, the General Assembly's intent in enacting the IPRRA was clear: it intended to exclude virgin and unused petroleum products from the IPRRA, while not allowing such a limitation to have an effect on liability under other statutory schemes. Accordingly, we find Power Test's argument to the contrary unpersuasive.

### 3. Persuasive Authority

Finally, Power Test claims that this Court should require proof of causation because other jurisdictions have so held based on their own environmental liability statutes, which Power Test claims are similar to Rhode Island's OPCA. However, after careful review of these statutes, we conclude that they are inapposite to the OPCA. We explain briefly.

The statutory framework upon which Power Test most heavily relies is a West Virginia environmental liability statute that prohibits contamination in excess of certain groundwater quality standards. W. Va. Code R. § 47-57-4 (effective May 1, 1994). The West Virginia statute requires that remediation be undertaken by "[a]ny person who owns or operates a source subject to the Act which has caused, in whole or in part, the concentration of any constituent to exceed any applicable groundwater quality standard subject to the Act * * *." W. Va. Code R. § 47-57-4.1. In the definition section of its act, the West Virginia statute defines a "source" as "any

- 14 -

facility or activity which has caused a release or is reasonably likely to cause a release." W. Va. Code R. § 47-57-2.13.

In construing these provisions, the West Virginia Supreme Court of Appeals noted that the "crucial question is whether [a] pre-existing contamination produced by a party unrelated to the landowner may be deemed a 'source' under the regulations." Cookman Realty Group, Inc. v. Taylor, 566 S.E.2d 294, 298 (W. Va. 2002). In assessing this question, the court recognized that "a landowner, in order to be deemed the owner of a 'source,' must be in control of a 'facility' or otherwise engaged in an 'activity' that causes such a release." Id. at 299. Accordingly, the court concluded that "a landowner may not be deemed the owner of a 'source' of groundwater contamination * * * where it is demonstrate[d] that neither the landowner nor its predecessors in title were involved in originating such pollution." Id. at 299-300.

Unlike West Virginia's statutory framework, the Rhode Island OPCA does not require that the liable party be the same type of "source" that is required under the West Virginia statute. Instead, the OPCA prohibits contamination by any "person," which it defines as "an individual, trust, firm, joint stock company, corporation (including a quasi government corporation), municipality, municipal or state agency, fire district, club, nonprofit agency, or country[.]" Section 46-12.5.1-1(8). Notably, this list of entities upon which liability may be imposed does not include the same requirement as the West Virginia statute, which requires that the "facility or activity * * * has caused a release or is reasonably likely to cause a release." See W. Va. Code R. § 47-57-2.13 (emphasis added). While the plain language of the West Virginia statute unambiguously includes an element of causation, Cookman Realty Group, Inc., 566 S.E.2d at

299-300, the OPCA contains no such requirement.[11]  Therefore, the OPCA is distinguishable from the West Virginia statutory framework.

In addition, Power Test cites to a number of other jurisdictions that have determined that their environmental liability statutes do not include passive migration of contaminants already present in the environment.  However, the statutory schemes in these jurisdictions are also distinguishable[12] from the OPCA in that those statutes explicitly require some nexus between the use of the substance by the responsible party and the resultant contamination.  See, e.g., New Jersey Department of Environmental Protection v. Dimant, 14 A.3d 780, 788 (N.J. Super. Ct. App. Div. 2011), aff'd as modified, 51 A.3d 816 (N.J. 2012) (determining that, under the New Jersey Spill Act, the definition of "discharge" which "explicitly refers to resultant 'damage[s]'" makes plain that "some nexus between the use or discharge of a substance and its contamination of the surrounding area is needed to support a finding of Spill Act liability").

---

[11] Moreover, while not the basis for the West Virginia Supreme Court's decision in Cookman Realty Group, Inc. v. Taylor, 566 S.E.2d 294 (W. Va. 2002), the West Virginia environmental liability statute requires the person who owns or operates a "source" to have "caused, in whole or in part, the concentration of any constituent to exceed any applicable groundwater quality standard subject to the Act * * *."  W. Va. Code R. § 47-57-4.1.  The OPCA contains no such requirement.  Instead, the OPCA merely requires the "person" to "discharge, cause to be discharged, or permit the discharge" of a contaminant.  G.L. 1956 § 46-12.5.1-3.

[12] Admittedly, the statutory scheme in California to which Power Test draws our attention presents some level of semblance to the Rhode Island OPCA—yet, the California Court of Appeals has interpreted it to not include passive migration through the soil.  See Consumer Advocacy Group, Inc. v. Exxon Mobil Corp., 128 Cal. Rptr. 2d 454, 459 (Cal. Ct. App. 2002) ("The[] definitions [of 'discharge' or 'release'] * * * all convey movement out of a confined space such as a container, not, as plaintiff suggests, simply movement from one point to another—the concept implicit in its claim that 'passive migration' or 'continued presence' are embraced within the meanings of 'discharge' and 'release' * * *.").  Notwithstanding the construction injected upon the California statutory scheme by its courts, we decline to adopt a similar construction to the Rhode Island OPCA.

- 16 -

In sum, despite Power Test's vigorous and multifaceted argument to the contrary, we conclude that the Rhode Island OPCA is sufficiently broad as to prohibit the passive migration of a contaminant in and below a landowner's property.

**B**

**Power Test's Knowledge of the Contamination**

Power Test next contends that the Superior Court improperly affirmed DEM's finding that it had knowledge of petroleum leaching under its property. Specifically, Power Test asserts that there was no evidence that it had knowledge of the petroleum on its property. Instead, it claims that the statement in the letter of responsibility that indicated that the pipelines were the "likely source of the petroleum" was too speculative to put it on notice of the petroleum leach. In addition, Power Test contends that any other evidence pointed to by the DEM hearing officer and the Superior Court to demonstrate notice merely showed that it had knowledge that there was petroleum in the groundwater of neighboring properties.

To be found in violation of the OPCA, DEM was required to prove that Power Test "permit[ted] the discharge of oil." Section 46-12.5.1-3(a). In order to "permit" such a discharge, one must have knowledge of its occurrence and fail to take measures to remediate it. Importantly, Power Test's knowledge of the contamination is a factual finding made by the DEM hearing officer and, as such, we afford such a finding great deference. Laprade, 94 A.3d at 513. In conducting our review, "[w]e do not weigh the evidence but merely ascertain whether the court was justified in rendering its judgment." Rhode Island Public Telecommunications Authority, 650 A.2d at 485. "Legally competent evidence is indicated by the presence of 'some' or 'any' evidence supporting the agency's findings." Id. (quoting Strafach, 635 A.2d at 280). "[A]n administrative decision can be vacated if it is clearly erroneous in view of the reliable,

probative, and substantial evidence contained in the whole record." Environmental Scientific Corp., 621 A.2d at 208 (quoting Costa, 543 A.2d at 1309).

In the case at hand, the record supports the Superior Court's determination that the DEM hearing officer had legally competent evidence to conclude that Power Test had knowledge that its property was the source of the petroleum contamination at the time the NOV was issued. Specifically, a letter of responsibility dated December 2, 2002, notified GPC, a general partner of Power Test, that there was petroleum found on an abutting property owned by CTC and that the pipelines on the Power Test property were the "likely source of the petroleum." In addition, a notice of intent to enforce was issued to Power Test by DEM on July 21, 2003, in which DEM sought to compel Power Test to undertake a site investigation. Both of these documents cited to the VHB report—which Power Test had access to—as DEM's basis for reaching this conclusion. In addition, DEM's hearing officer made a finding of fact, that "[t]he presence of the petroleum product in the groundwater was made know[n] to [Power Test] on or after March 22, 2002." Presumably, this finding was based upon the discovery of LNAPL in groundwater monitoring well OW-0102A and GPM's investigation after notification of such discovery. Notably, the Power Test property was required to be excavated in order for GPM to perform this investigation. These facts represent "some" or "any" evidence to support the agency's findings.

Nevertheless, Power Test complains that this evidence was too speculative. Distilled to their essence, Power Test's arguments with regard to its knowledge of petroleum contamination are that none of the evidence conclusively proved to Power Test that the pipelines on its property were the source of the petroleum. Instead, the notices indicated that the petroleum was discovered on neighboring property and that the pipelines were the "likely" or "probable" source

of the petroleum. According to Power Test, any other evidence presented to it merely proved that there was petroleum on neighboring property.

For Power Test to be aware that it was permitting a discharge, it need not be shown that Power Test knew to a certainty that a discharge was occurring beneath its property. Through two separate correspondences preceding the NOV, Power Test was informed by DEM that there was a contaminant discovered nearby and that its pipelines were the likely source of this contamination. In addition, these correspondences indicated that DEM's basis for such a conclusion was the VHB report that had been transmitted to it by CTC. An examination of the VHB report reveals that DEM's conclusion that Power Test was the likely source was predicated upon the fact that the pipelines are upgradient of the LNAPL discovery and that the discovered LNAPL was found to have contained lead and that, based upon the age of the pipelines, it was probable that leaded gasoline was transported through them. In light of this information, it is clear that Power Test had knowledge that it was permitting a discharge on its property. To say otherwise would enable Power Test to turn a blind eye to the probability of contamination merely because DEM had not informed Power Test that it was the definitive source of the contamination. We decline to allow such a result. Accordingly, we conclude that DEM's finding that Power Test had knowledge that it was permitting a discharge of oil contaminants was supported by substantial evidence on the record. See, e.g., Rocha v. State Public Utilities Commission, 694 A.2d 722, 727 (R.I. 1997).

## C

### Evidence of Leaching onto the CTC Property

Similarly, Power Test contends that there was no evidence that the petroleum was leaching from the groundwater under the Power Test property into the groundwater under the

CTC property. Based upon this lack of evidence, Power Test contends that it should not be held liable for remediating the CTC property in addition to its own.

Power Test's assertion is belied by the record. The VHB report provides evidence to support the DEM hearing officer's conclusion that the Power Test property was the likely source of the petroleum contamination on the CTC property. The hearing officer's basis for such a determination was twofold. First, the fact that the pipelines are upgradient of the LNAPL discovery suggests that the LNAPL traveled downslope to the CTC property. Second, the LNAPL that was sampled from the CTC property was found to have contained lead and, based upon the age of the pipelines, it was probable that leaded gasoline had been transported in the pipelines. This evidence alone is more than plentiful to satisfy the "some" or "any" evidence standard applied to the factual determinations of an administrative agency. See Rhode Island Public Telecommunications Authority, 650 A.2d at 485 ("Legally competent evidence is indicated by the presence of 'some' or 'any' evidence supporting the agency's findings." (quoting Strafach, 635 A.2d at 280)). Accordingly, we conclude that the Superior Court properly determined that DEM did not err in holding Power Test liable for remediating both its own property and the CTC property.[13] See Environmental Scientific Corp., 621 A.2d at 208 ("[A]n

---

[13] Power Test also seems to indirectly suggest that it should not be held liable for the cleanup of land which it does not own. However, the OPCA prohibits "the discharge of oil into, or upon the waters or land of the state." Section 46-12.5.1-3(a). Further, in enacting the OPCA, the Legislature recognized that, "[t]he citizens of this state should not have to bear the burdens of the cleanup and the losses of economic livelihood that result from the discharge of oil in any degree[.]" Section 46-12.5.1-6(a)(2). Based upon the language of the prohibition and the purpose of the statute, it is clear that the burden of cleanup should not fall upon the landowner to which the oil may have leached. Instead, the person who causes the discharge or permits the discharge of oil—here, Power Test—is liable for the remediation.

administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record." (quoting <u>Costa</u>, 543 A.2d at 1309)).

**IV**

**Conclusion**

For the reasons set forth above, we affirm the judgment of the Superior Court and quash the writ of certiorari heretofore issued.  The materials associated with this case may be remanded to the Superior Court.

# RHODE ISLAND SUPREME COURT CLERK'S OFFICE



## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        Power Test Realty Company Limited Partnership v. Janet Coit, in her official capacity as Director of the Rhode Island Department of Environmental Management.

**CASE NO:**        No. 2013-76-M.P.
(PC 10-404)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   March 4, 2016

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Walter R. Stone

**ATTORNEYS ON APPEAL:**

For Plaintiff:   Jennifer R. Cervenka, Esq.
Paul Kessimian, Esq.

For Defendant:  Susan B. Forcier, Esq.